Dorothy FRAZIER, Plaintiff-Appellant,

v.

The BOARD OF TRUSTEES OF NORTHWEST MISSISSIPPI REGIONAL MEDICAL CENTER, et al., Defendants-Appellees.

No. 83–4679.

United States Court of Appeals, Fifth Circuit.

July 22, 1985.

Kossman & Kossman, Nancy P. Kossman, L. Paul Kossman, Cleveland, Miss., for plaintiff-appellant.

Merkel & Cocke, John H. Cocke, Walter Stephens Cox, Clarksdale, Miss., for Bd. of Trustees of NWMRMC & Clifford L. Johnson, Etc.

Frank C. Kruppenbacher, Paul H. Bowen, Orlando, Fla., for Lifetron Systems, Inc., et al.

Before GOLDBERG, RUBIN and HILL, Circuit Judges.

GOLDBERG, Circuit Judge:

This appeal confronts us with a paragon of unclarity, a paradigm of mutuality, and a plethora of pittances. The paragon is whether, by virtue of their contractual and operational relations with a county hospital, a private employer and some of its employees acted "under color of state law" within the meaning of 42 U.S.C. § 1983 (1982). The paradigm is whether these same private actors became "recipients" of federal assistance when paid by a federally funded county hospital such that they can be held accountable for their allegedly discriminatory conduct under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982). The pittances concern a refusal to grant relief pursuant to Fed.R. Civ.P. 60(b)(6), a denial of attorney's fees, and other sundry procedural rulings by the trial court.

I

A

Lifetron, Inc. (formerly Vitraton Systems, Inc.), is a privately-owned and -operated corporation that provides respiratory therapy care to facilities such as Northwest Mississippi Regional Medical Center. Northwest, in turn, is a county hospital organized under Mississippi law and run by a Board of Trustees appointed by the Board of Supervisors of Coahoma County, Mississippi. In December of 1980, Lifetron and Northwest entered into a contract whereby Lifetron was to staff and run the hospital's respiratory therapy department. When the agreement took effect on February 1, 1981, the employees in the hospital's self-run respiratory therapy section (other than individuals with a minimum of ten years' employment at Northwest) became employees of Lifetron. Subject to the rules and policies of the hospital and its medical staff, Lifetron was the final authority over who was promoted or demoted, hired or fired.

In return for its services, Lifetron was to receive every month from Northwest a minimum flat fee supplemented by twenty percent of any gross respiratory-therapy-patient revenues over a certain amount. The agreement stated that Lifetron was an independent contractor and that Northwest was to pay Lifetron for services rendered, rather than as a function of Northwest's having billed or even collected payment from its respiratory therapy patients. The contractual relationship between Lifetron and Northwest was thus bilateral in both execution and effect: Lifetron had an agreement only with Northwest, which it-

self retained sole dominion over the billing of patients.

In contrast with these mutually exclusive spheres—Lifetron with its relative independence over those in its employ, and Northwest with its unshared authority to bill patients—the day-to-day operations of the hospital and the independent contractor were more entwined. Northwest provided for most or all of Lifetron's utilities as well as for some of the respiratory therapy equipment; Lifetron's office was located in the hospital building; Lifetron's patients were the hospital's patients; and finally, Lifetron's activities were subject not only to its own departmental policy and procedure manual but also to the hospital's policy regarding patient care. A patient in need of respiratory therapy would apparently never know that his care was being furnished by anyone other than the hospital staff.

### B

Dorothy Frazier was a respiratory therapist employed by the hospital when Lifetron took over the management of Northwest's respiratory therapy department in February of 1981. Consistent with the arrangement between Northwest and Lifetron, Frazier became an employee of Lifetron, which soon demoted her from supervisor of the eleven-to-seven shift to technician on the seven-to-three shift. She was told by her new supervisor, Wes Cummings, as well as by two subsequent Lifetron supervisors, Bryan Parker and Tony Nolan, that her demotion stemmed from negative comments in her Northwest personnel file.

On January 29, 1982, Frazier filed suit in federal district court for the Northern District of Mississippi against Northwest and Lifetron, as well as against Cummings, Parker, Northwest's personnel manager (Fred Hood), and Northwest's administrator in charge of operations (Clifford Johnson).[1] The complaint alleged that Northwest and Lifetron had penalized Frazier for having spoken out against deficiencies in the respiratory care at Northwest and for her history of a nervous breakdown sixteen years earlier. In Frazier's view, Northwest and Lifetron, acting through each of the above-named individuals, had conspired to plant adverse documentation in her personnel file with an eye toward her eventual discharge. These activities purportedly deprived Frazier of her constitutional rights under color of state law within the meaning of 42 U.S.C. § 1983[2] by impermissibly burdening (1) Frazier's first amendment right to criticize patient care, (2) her procedural due process right to a hearing on the validity of the reports contained in her personnel file, and (3) her equal protection right not to be discriminated against because of her history of mental instability. The complaint sought damages for back pay and emotional distress, as well as injunctive relief to restore her to her former supervisory position and to afford her the opportunity to contest the reports in her personnel file.

Some three months into the lawsuit, on April 21, 1982, Lifetron fired Frazier for having violated departmental policy by speaking to nursing personnel instead of to her supervisor about perceived flaws in the administration of treatment in the department. Frazier responded with a motion to amend her complaint and for a preliminary

---

**1.** In addition, Frazier named as defendants four other individual employees of Northwest, as well as Johnson and Hood, on the pendent state law theories of libel, slander, and tortious interference with contractual relations. The district court sua sponte dismissed the pendent claims without prejudice on the ground that they bore no essential relationship to Frazier's federal claims.

**2.** Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

injunction reinstating her as Lifetron's employee at the hospital. The court granted the motion on May 28, allowing Frazier to bolster her claims of discrimination with the added fact of her discharge, and to join her then-current supervisor Tony Nolan (a Lifetron employee) as a defendant.[3] The court also granted the requested injunctive relief, reasoning that in light of the then-prevailing law, the relationship between Lifetron and Northwest was sufficient to characterize Frazier's discharge as "state action" for purposes of her section 1983 claim, that there was a substantial likelihood of plaintiff's success on the merits of that claim, and that the equities as between Frazier's prolonged unemployment and Lifetron's patience weighed in favor of granting the requested relief.[4]

Several months of depositions ensued, but on August 20, 1982, the district court granted a motion for summary judgment in favor of defendants Northwest and its employees, Johnson and Hood. The summary disposition was based on a lack of evidence that Northwest or any of its employees had had anything to do with the decisions to demote or to discharge Frazier: in the district court's view, these actions were attributable solely to Lifetron in its capacity as Frazier's employer. On April 19, 1983, the court entered a final judgment dismissing the claims against the Northwest defendants pursuant to Fed.R.Civ.P. 54(b). Frazier never appealed this order.

Another five months of deposition squabbles passed before the district court, on September 12, 1983, entered an order vacating the preliminary injunction and granting the remaining defendants' motion for summary judgment. The court reasoned that in the interim since it had granted Frazier's request for preliminary injunctive relief, the Supreme Court had handed down *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)[5]—cases that altered the concept of state action as it applies to the conduct of private parties. In the district court's view, these cases dictated that Lifetron and its employees could no longer be characterized as having acted under color of state law for purposes of the plaintiff's section 1983 claim. As to Frazier's claim under section 504 of the Rehabilitation Act, the court noted our decision in *Brown v. Sibley,* 650 F.2d 760 (5th Cir.1981), which held that standing to sue under section 504 exists only where an otherwise qualified plaintiff can show that he was discriminated against by a particular program or activity that is a "recipient" of federal funds within the meaning of the statute. *Id.* at 770. The district court concluded that while Northwest is a recipient for purposes of a section 504 claim, the "nexus" between the Medicare and Medicaid funds received by Northwest and the payment ultimately channeled to Lifetron "is so attenuated as not to be actionable by a plaintiff having the status of an employee of a private contractor furnishing respiratory services to a county-owned hospital." Accordingly, the court dismissed Frazier's claim under section 504 as well as that under section 1983.

3. Frazier's motion to amend also named as defendants two additional Lifetron officers who were soon dismissed from the action for lack of personal jurisdiction.

4. Although Frazier was reinstated pursuant to the court's injunction, Lifetron subsequently suspended her with pay pending an investigation of allegations that she had changed a doctor's orders regarding a patient. The court denied her motion for an order to show cause as to why Lifetron had varied from the terms of the court's previous preliminary injunction. Frazier did not move to file a supplemental complaint adding these latest events until Sep-

tember 9, 1983, a day after the court had issued the order granting summary judgment for the Lifetron defendants. Since the court denied this motion as well, the record on appeal consists solely of the events surrounding her demotion and initial discharge.

5. *Rendell-Baker* and *Blum* were the second and third cases of a state-action trilogy that the Court decided on the same day. The first of the three, *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), held that a private party had acted under color of state law for purposes of § 1983 by invoking a state's system of prejudgment attachment.

On September 23, 1983, Frazier filed a motion under Rules 59(e), 60(b)(3), and 60(b)(6), asking, among other things, for the court to alter and amend its final judgment of September 12 in favor of Lifetron and its employees, as well as for relief from the court's order of April 19, which had directed the entry of final judgment in favor of Northwest and its employees pursuant to Rule 54(b). The district court denied the motions in an order entered October 3, and it is from this and the September 12 orders that Frazier now appeals.

## II

■ A claim for relief under section 1983 requires a showing of two elements: first, that the claimant has been deprived of a right "secured by the Constitution and laws" of the United States, and second, that the deprivation was conducted "under color of any statute ... of any State." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Often implicit in the first component, and always related to the second, is the requirement of "state action." Most constitutional rights are secured from infringement by governments, not private parties. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974); *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); *The Civil Rights Cases,* 109

U.S. 3, 17–18, 3 S.Ct. 18, 25–26, 27 L.Ed. 835 (1883); *Ex parte Virginia,* 10 Otto 339, 346, 100 U.S. 339, 346, 25 L.Ed. 676 (1880). Where, as here, a party predicates her section 1983 claim on the infringement of her rights to free speech, due process, and equal protection, that party must demonstrate that her first and fourteenth amendment loss stemmed from conduct properly or fairly attributable to the state.[6] *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982); *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 156–57, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). Viewed in the context of a claim under section 1983, a showing of state action serves a two-fold purpose. State action, while necessary to establish the deprivation of any of these constitutional rights, when present is also sufficient to meet the under-color-of-law element of section 1983 itself. *Lugar,* 102 S.Ct. at 2753.[7]

■ Although the state action inquiry has been characterized variously as a "paragon of unclarity," a "protean concept," and an "impossible task,"[8] at least our goal is relatively well-marked. "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the state?'" *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (quoting *Lugar,* 102

---

**6.** Since the first amendment limits state conduct through the due process clause of the fourteenth amendment, section 1983 claims alleging free speech deprivations require state action as much as do those claims founded on constitutional provisions which by their terms apply only to conduct of the states. *See Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

**7.** It seems, most recently, that while the existence of state action denotes the coexistence of action under color of state law, the converse is not necessarily true. *See Lugar,* 102 S.Ct. at 2753 n. 18. It remains "clear that these two elements denote two separate areas of inquiry." *Id.* at 2750, 2753 n. 18 (quoting *Flagg Brothers,* 436 U.S. at 155–56, 98 S.Ct. at 1732–33).

**8.** *See Reitman v. Mulkey,* 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967) ("This

Court has never attempted the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations' has become significantly involved in private discriminations."); Black, *The Supreme Court, 1966 Term—Foreward: "State Action," Equal Protection, and California's Proposition 14,* 81 Harv.L.Rev. 69, 89 (1967) ("[E]ight decades of metaphysical writhing around the 'state action' doctrine have made it the paragon of unclarity."); Lewis, *The Meaning of State Action,* 60 Colum.L.Rev. 1083, 1085 (1960) (state action as a "protean concept"); *see also* Black, *supra,* at 88 ("Now, with the greatest respect, there were and are no clear and concrete tests of state action; the concept is notoriously, scandalously lacking in these; it is itself nothing but a catchphrase.").

S.Ct. at 2754). Under the fair attribution test, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982), *quoted in Rendell-Baker,* 102 S.Ct. at 2771. If Lifetron's decisions to demote and to discharge Frazier are fairly attributable to the state through Northwest,[9] then the state action and under-color-of-law elements of Frazier's section 1983 claim will have been satisfied. Conversely, if Frazier's dilemma amounts to no more than a private employer's internal decision over the composition of its staff, then section 1983 cannot be the source of redress for Frazier's employment grievance against Lifetron.[10]

█ Imbued with an identity all its own, every state action inquiry partakes only slightly of the factual stuff of other cases.[11] Still, the Supreme Court's treatment of *Rendell-Baker* is instructive. As in our case, the plaintiff in *Rendell-Baker* asserted a section 1983 claim against a private party and sought to characterize the defendant's actions as those of the state. There, the petitioners had been discharged by a private school allegedly in violation of their first, fifth, and fourteenth amendment rights. The school—a nonprofit institution teaching mostly students with special needs—was located on privately-owned property and was operated under a Board of Directors composed solely of individuals from the private sphere. None were public officials, nor had any been chosen by public officials. The school, however, received most of its referrals from public school committees and from the Drug Rehabilitation Division of the state's Department of Mental Health. A state statute required that the school committees themselves pay for the education of students they referred, and since this particular school also received funds from several other state and federal agencies, public funds accounted for between 90 and 99% of the school's operating budget. Moreover, the school had to comply with a variety of state regulations; in particular, the school was required to maintain written job descriptions and written descriptions of personnel standards and procedures. Although employment contracts specified that school employees were not city employees, and although most of the petitioners in *Rendell-Baker* were teachers at the school, Rendell-Baker was herself a vocational counselor who had been hired pursuant to a federal grant. Consequently, the state's Committee on Criminal Justice had to approve the school's initial decision to hire her.

Tracking its analysis in the companion case of *Blum,* 102 S.Ct. at 2786–90,[12] the

---

**9.** Northwest, as a county hospital, is a "person" to whom § 1983 applies. *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); *Crane v. Texas,* 759 F.2d 412, 420 (5th Cir.1985); *Eguia v. Tompkins,* 756 F.2d 1130, 1133 (5th Cir.1985).

**10.** Subject to the discussion in Part IV below, our consideration of appellant's § 1983 claim is limited to the private defendants—Lifetron and its employees. As noted earlier, the district court dismissed with prejudice Frazier's claims against Northwest and its employees on the ground that Frazier had not "come forward with receivable facts which place in issue [these defendants'] involvement" in her demotion or discharge. Record vol. 1, at 251, 252. Frazier never appealed from this order after the district court ordered its entry as a final judgment pursuant to Rule 54(b), and her time for appeal has long since lapsed.

**11.** As the Court stated in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961):

[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." *Kotch v. Board of River Port Pilot Com'rs,* 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 [ (1947) ]. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.

*Id.* at 722, 81 S.Ct. at 860; *see also Evans v. Newton,* 382 U.S. 296, 299–300, 86 S.Ct. 486, 488–89, 15 L.Ed.2d 373 (1966).

**12.** *Blum,* which involved an effort to hold state officials liable for the conduct of private parties, was "obviously different from those cases in

Court in *Rendell-Baker* examined four factors [13] in determining whether the private school's conduct bore a relationship with the state sufficiently close to warrant calling the school's personnel decisions "state action." First, the Court cited *Blum* for the proposition that "the school's receipt of public funds does not make the discharge decisions acts of the state." *Rendell-Baker*, 102 S.Ct. at 2771. Focusing on the state's role in the type of dispute before it, the Court noted that "the relationship between the school and its teachers and counselors is not changed because the state pays the tuition of the students." *Id.* (citing *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1982) [14]). Similarly, the fact that the school was mostly or totally engaged in the performance of public contracts did not erase its status as a private contractor; financial involvement with the state was insufficient to convert a private personnel decision into state action.

The Court next considered the impact of state regulation on the nature of the private actor's conduct. Acknowledging that the state extensively regulated the school's operations, the Court held that this too was not enough to implicate state action. The most that could be said for the state's involvement in the decision to discharge the teachers was that the Committee on Criminal Justice had the authority to approve the hiring of vocational counselors. Again, the focus was narrower than the mere fact or even degree of involvement: "the *decisions to discharge* ... were not compelled or even influenced by any state regulation."

*Id.* 102 S.Ct. at 2772 (emphasis added); *see also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (holding that state regulation, even if "extensive and detailed," was insufficient to convert a utility's actions into those of the state).

Third, the Court evaluated whether the school merited state-actor status because it performed a "public function." The public function test requires that the function performed be " 'traditionally the *exclusive* prerogative of the State.' " *Rendell-Baker*, 102 S.Ct. at 2772 (quoting *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454). Since the provision of special services for students was neither a traditional nor an exclusive state task, the Court found that the state had not avoided responsibility by delegating a "public function."

The final factor reflected the theory of "joint participation" recognized in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where the Court held that a restaurant's refusal to serve blacks constituted state action since, among other things, the restaurant was located on the premises of a public parking garage and the garage profited from the discriminatory conduct of the restaurant. *Id.* at 723–25, 81 S.Ct. at 860–61. Under the theory of joint participation or "symbiotic relationship," "Conduct that is formally 'private' may become so entwined with governmental policies or so impreganted with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299, 86

which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the state so as to make it 'state' action for purposes of the fourteenth amendment." *Blum*, 102 S.Ct. at 2785. While the present suit, like *Rendell-Baker*, falls within the latter category of cases, the analysis of state action under either brand of facts is largely if not wholly the same. *Compare id.* at 2785, 2788 n. 20 *with Rendell-Baker*, 102 S.Ct. at 2770–72.

13. The First Circuit has aptly noted that "the various formulae established in the many Supreme Court opinions examining the existence

of state action are not tests in the traditional sense. More precisely, they are different methods of analyzing and appraising the facts and circumstances of a particular case." *Gerena v. Puerto Rico Legal Servs., Inc.*, 697 F.2d 447, 449 n. 2 (1st Cir.1983).

14. *Polk County* was a § 1983 suit by a client against his public defender. The Court held that although the state employed the attorney, her relationship with her client was "identical to that existing between any other lawyer and client," 102 S.Ct. at 446, and that the attorney had therefore not acted under color of state law.

S.Ct. 486, 488, 15 L.Ed.2d 373 (1966); *see also Terry v. Adams,* 345 U.S. 461, 467–70, 73 S.Ct. 809, 812–13, 97 L.Ed. 1152 (1953); *Public Utilities Commission v. Pollak,* 343 U.S. 451, 462, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952); *Marsh v. Alabama,* 326 U.S. 501, 505–09, 66 S.Ct. 276, 278–80, 90 L.Ed. 265 (1946); *Smith v. Allwright,* 321 U.S. 649, 659–65, 64 S.Ct. 757, 762–65, 88 L.Ed. 987 (1944). In *Rendell-Baker,* the Court distinguished the joint participation present in *Burton* from the private school situation before it on the ground that "the school's fiscal relationship with the State is not different from that of many contractors performing services for the government." 102 S.Ct. at 2722. No more was written of *Burton.*

If a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the state. Rather, private conduct is fairly attributable only when the state has had some affirmative role, albeit one of encouragement short of compulsion,[15] in the particular conduct underlying a claimant's civil rights grievance. "The purpose of this [close nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the

specific conduct of which the plaintiff complains." *Blum,* 102 S.Ct. at 2786; *see Smith v. North Louisiana Medical Review Association,* 735 F.2d 168, 173 (5th Cir. 1984).[16] With this principle in mind, we turn to the facts of this case.

Appellant has few routes by which to contend that Lifetron's decision to demote and fire her constituted state action. While Lifetron's income flowed directly from Northwest both on a fixed-fee and percentage basis, public funding alone is insufficient to implicate the state in the discharge decisions of a private actor.[17] In addition, there is no evidence of the sort of "extensive and detailed" regulation that would be required to impute Lifetron's personnel decisions to the state; at most, Lifetron's staff operates subject to the hospital's policies and procedures, but even assuming some degree of cooperation between the personnel departments of Northwest and Lifetron,[18] Lifetron retained authority over how it would organize employees within its department and over whom it would fire. And as to "public function," there has been no contention that respiratory therapy, however valuable an asset of medical care, is an activity that has traditionally been the exclusive prerogative of the state. "That a private entity performs a function which serves the public does not

**15.** *See, e.g. Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 176–77, 92 S.Ct. 1965, 1971, 1973, 32 L.Ed.2d 627 (1972) (discussing whether state's statutes and regulations "foster or encourage" discrimination).

**16.** *See also Blum,* 102 S.Ct. at 2789 ("[A]lthough the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.")

**17.** Frazier has not argued under the due process clause of the fifth amendment that Lifetron should be characterized as a federal actor by virtue of its receipt of Medicare and Medicaid funds from Northwest, the direct recipient of these federal funds. *Cf. Gerena v. Puerto Rico Legal Servs., Inc.,* 697 F.2d 447, 449–52 (1st Cir.1983) (holding that plaintiff's discharge by

private legal services corporation could not be fairly attributed to federal government by virtue of federal funding channeled through a federally established "parent" legal services corporation). The federal funding issue appears in somewhat different form, however, in the context of appellant's § 504 claim. *See* Part III *infra.*

**18.** Frazier's failure to file a timely notice of appeal following the district court's Rule 54(b) order of final judgment in favor of the Northwest defendants is not without consequences. *See* note 10 *supra.* While the record does contain evidence that the Northwest defendants were not unaware of Frazier's situation in the respiratory therapy department—indeed, her initial demotion was based chiefly on her personnel file as it existed at the time Lifetron took over the department—Frazier is collaterally estopped from asserting that the Northwest defendants were somehow responsible for her employment misfortunes.

make its acts state action." *Rendell-Baker*, 102 S.Ct. at 2772 (footnote omitted).

Appellant's best argument is that Lifetron and Northwest shared a symbiotic relationship akin to that in *Burton*. As the district court quite properly observed, however, *Burton* is now subject to the gloss of *Rendell-Baker* and *Blum*. The "joint" of 1961 does not the "symbiosis" of today make.

It would be disingenuous not to acknowledge the tension that exists between the holdings of *Burton* and *Rendell-Baker*. Both cases involved a significant degree of financial integration between the public and private actors; indeed, Massachusetts's funding in *Rendell-Baker* arguably rose to a greater level of governmental involvement than did the Wilmington Parking Authority's lease to and profit-by-association with the Eagle Coffee Shoppe. Perhaps more pointedly, if fair attribution is the guiding light of state action through private means, it is difficult to see how the state in *Burton* was any more "responsible" for the restaurant's decision not to serve blacks than was the state in *Rendell-Baker* for the school's decision to discharge its teachers. Nonetheless, *Burton* clearly remains good law.[19]

■ The relation between Lifetron and Northwest is not dissimilar to that involved in *Burton*, where the restaurant and garage were physically and financially integrated; the city was responsible for the repair and upkeep of the entire building; and the garage profited realistically, if not

contractually, from the racial discrimination practiced at the Eagle. In the present case, Lifetron is located on hospital premises; Northwest pays for Lifetron's utilities and furnishes some of the equipment used in the respiratory therapy department; and Northwest directly profits from the patients who use Lifetron's services. Finally, the anomalies lurking in *Burton* seem equally applicable today:

> It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, but at the same time fully enjoys equal access to nearby restaurants in wholly privately owned buildings.

365 U.S. at 724–25, 81 S.Ct. at 861. Had Frazier worked elsewhere within the hospital as an employee of Northwest, her current state action dilemma would have vanished as ashes in the wind.[20]

■ Viewed in light of *Rendell-Baker*, however, *Burton* is distinguishable, and the irony is no more than a red herring. Unlike in the present case, the garage's profits in *Burton*, earned through the discriminatory practices of its lessee, "not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency." *Id.* at 724, 81 S.Ct. at 861. This element of indispensabil-

---

19. *See Roberts v. Louisiana Downs, Inc.,* 742 F.2d 221, 223–24 (5th Cir.1984); *Krynicky v. University of Pittsburgh,* 742 F.2d 94, 99–101 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). However, to the extent the state action inquiry could ever be framed as whether nongovernmental conduct is "so 'purely private' as to fall without the scope of the Fourteenth Amendment," *Burton,* 365 U.S. at 725, 81 S.Ct. at 862, the *Lugar* troika makes clear that the burden of showing the existence or absence of state action now rests on different shoulders. *See* note 5 *supra.*

20. We are not faced with allegations that Northwest attempted to sidestep its constitutional responsibilities by delegating part of its operations

to private contractors. Indeed, we agree that "[t]he State should not be permitted to avoid constitutional requirements simply by delegating its statutory duty to a private entity." *Rendell-Baker,* 102 S.Ct. at 2776 (Marshall, J., dissenting) (footnote omitted). A sham delegation of state tasks would clearly implicate both the state action and the under-color-of-law requirements of section 1983. *See id.* at 2772 n. 7; *cf. Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (plurality opinion); *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944).

ity—at the core of the joint participation in *Burton*—is lacking here.[21] Moreover, *Rendell-Baker* dictates that the ultimate question is whether the conduct in a particular case is fairly attributable to the state. A symbiotic relationship, where present, denotes a level of functional intertwining whereby the state plays some meaningful role in the mechanism leading to the disputed act.[22] In the present case, we return again to the facts that Lifetron retained ultimate control over its own personnel and that Northwest and its employees have been adjudicated innocent of any material involvement in the decisions to demote and to discharge Frazier.[23] There is no symbiotic relationship in this case. *Cf. Miller v. Hartwood Apartments, Ltd.*, 689 F.2d 1239, 1242–44 (5th Cir.1982); *Taylor v. St. Clair*, 685 F.2d 982, 987 (5th Cir.1982); *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873, 877–82 (5th Cir.), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975); *Arlosoroff v. NCAA*, 746 F.2d 1019, 1021–22 (4th Cir.1984); *McGillicuddy v. Clements*, 746 F.2d 76, 77 (1st Cir.1984); *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1580–81 & n. 4 (D.C.Cir.1984); *Crowder v. Conlan*, 740 F.2d 447, 450–53 (6th Cir. 1984); *Gilmore v. Salt Lake Community Action Program*, 710 F.2d 632, 638–39 (10th Cir.1983).

In sum, we do not today deal with nursing homes, teachers, garnishees, or restaurateurs. Instead, we are faced only with the narrow issue of whether the decisions of a particular private respiratory therapy company to demote and to discharge this plaintiff can be fairly attributed to the state for purposes of stating a claim under section 1983. Bearing in mind that "[d]ifferences in circumstances beget appropriate differences in law," *Whitney v. State Tax Commission*, 309 U.S. 530, 542, 60 S.Ct. 635, 640, 84 L.Ed. 909 (1940), we hold that the victimization in this case, if any, was not the product of state action. The district court properly dismissed appellant's section 1983 claim.

### III

 To paraphrase a refrain from another context, we hope not to belittle the question presented by appellant's second claim when we frame the issue as, "When is a recipient a recipient?"[24] Frazier's complaint alleged that her demotion and discharge had been motivated by her history of mental impairment in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982). *See also id.* § 706(7)(B) (defining "handicapped individual").[25] Having already dismissed Frazier's claims against the Northwest defendants for lack of evidence implicating them in the relevant staffing decisions, the dis-

**21.** While we are of course unable to distinguish another significant aspect of the joint relationship in *Burton* —the private actor's presence on government property, *cf. Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1972)—the sharing of space is not alone sufficient in this case to impute responsibility to the state for appellant's demotion and discharge.

**22.** Where public and private entities are indeed functionally symbiotic, any act of the private entity will be fairly attributable to the state even if it cannot be shown that the government played a direct role in the particular action challenged. *See Burton,* 365 U.S. at 725, 81 S.Ct. at 861 ("The State has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity....."); *Gerena v. Puerto Rico Legal Servs., Inc.,* 697 F.2d 447, 451 (1st Cir.1983) (observing that, where a

symbiotic relationship exists, "plaintiff need not show how the government was involved in the challenged action. Rather, the government is charged with all actions of the private party.").

**23.** *See* notes 10, 18 *supra.*

**24.** *See Adamo Wrecking Co. v. United States,* 434 U.S. 275, 278, 98 S.Ct. 566, 569, 54 L.Ed.2d 538 (1978) (framing the issue as, " 'When is an emission standard not an emission standard?' ").

**25.** Frazier clearly suffered a nervous breakdown in the past. Since the parties do not raise whether this history and Frazier's other emotional problems were sufficient to make her a "handicapped individual" within the meaning of § 504, *see* 29 U.S.C. § 706(7)(B), we intimate no opinion on that question. *But cf. Doe v. Region 13 Mental Health-Mental Retardation Comm'n,* 704 F.2d 1402, 1407–08 & n. 6 (5th Cir.1983).

trict court held that the Lifetron defendants were not subject to the Rehabilitation Act's antidiscrimination provisions because Lifetron was not a "program or activity receiving Federal financial assistance" under section 504 of the Act. *Id.* § 794. Because we believe that Lifetron does indeed satisfy section 504's subject matter threshold, we reverse this part of the district court's order.

Section 504 of the Act provides in pertinent part that

> [n]o otherwise qualified handicapped individual ... shall, solely, by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

*Id.* As a hospital receiving Medicare and Medicaid payments, Northwest is prohibited from discriminating against otherwise qualified individuals based on handicap. *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1040–41 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985).[26] The question before us is a variation on that theme: Is a private contractor of services that are integral to the operation of a recipient hospital also a recipient by virtue of a contractual relationship that links both parties' revenues to the receipt of Medicare and Medicaid payments?

While the present inquiry obviously resembles that in Part II above, we are here concerned with a much more circumscribed aspect of the relation between Lifetron and Northwest. Focusing properly on the financial arrangement between the two, Lifetron contends that its status is no different from that of the company the hospital hires to mow its lawn, clean its floors, or supply its aspirin, and that if we hold Lifetron subject to section 504, we will have read any meaningful limits out of the statute by allowing its application to each of these types of contracted-for services. In the instant case, the hospital fulfills its contractual obligations out of a general fund, the composition of which is part Medicare and Medicaid payments, part non-federal in origin. On appellees' view, we cannot say that a non-recipient contractor turns recipient merely because it is paid by a recipient hospital.

The view is not without some intuitive sway. Under the terms of its contract, Lifetron is to be paid monthly within thirty days of submitting an itemized invoice for past services rendered, and payment is to be made irrespective of Northwest's ability to collect payment either from patients or from the federal government. Given this method of payment, Northwest's Medicare and Medicaid receipts are not in any formal way earmarked for Lifetron.

We are not bound, however, to the formalisms of the contractual method of payment in analyzing the reality of Lifetron's financial nexus to Northwest. Far from being a cinctured financial island within the hospital, Lifetron's revenue was *in fact* linked to the hospital's receipt of Medicare and Medicaid funds even if the terms of their contractual agreement created a theoretical moat—the androgynous "general fund"—between them. Under these circumstances, appellant has clearly satisfied the test for stating a claim under section 504: "that the program or activity with which ... she was involved, or from which ... she was excluded, itself received *or was directly benefited* by federal financial assistance." *Brown v. Sibley*, 650 F.2d 760, 769 (5th Cir.1981) (emphasis added). Indeed, viewing the evidence most favorably to appellant, the respiratory therapy department kept weekly tallies of the number of Medicare and Medicaid patients

---

**26.** It is of no consequence that Medicare and Medicaid funds are not distributed for the purpose of providing employment for the handicapped. The Supreme Court has held that a § 504 "suit for employment discrimination may be maintained even if [the recipient] receives no federal aid the primary purpose of which is to promote employment." *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1256, 79 L.Ed.2d 568 (1984); *see also North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 1922–23, 72 L.Ed.2d 299 (1982) (rejecting "primary purpose" requirement under title IX).

treated in the department. Record vol. 2, at 432–35. More importantly, the contract provided that Lifetron would recompense Northwest in the event that "third-party payors" disallowed any of the hospital's claims for reimbursement based on services rendered by Lifetron.[27] In light of these facts, it is difficult to fathom how Lifetron's interest in the hospital's federal assistance was limited to that of a disinterested spectator. Both Northwest and Lifetron reaped a percentage benefit of revenues generated by Medicare and Medicaid patients treated in the respiratory therapy department.

It is this mutual benefit that distinguishes Lifetron's womb-like financial situation from that of a private contractor with no material relationship to the recipient's receipt of federal funds. Unlike the hospital's privately-contracted mower of lawns, sweeper of floors, or supplier of aspirin, Lifetron contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid. That the federal check does not bear Lifetron's name is no answer to the fact that the check would not have been written at all were it not for Lifetron's performance as a de facto subdivision of Northwest. Appellees' parade of horribles is no Mardi Gras.

Our conclusion is reinforced by the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In *Grove City*, the Court held that where a college program or activity receives federal monies in the form of Basic Educational Opportunity Grants ("BEOGs")—federal grants extended to college students for college expenses—the program or activity must comply with title IX of the Education Amendments of 1972, Pub.L. No. 92–318, § 901, 86 Stat. 373 (codified as amended at 20 U.S.C. § 1681(a) (1982)). 104 S.Ct. at 1222. The Court reached this decision despite the fact that under title IX—which, like section 504, was modeled on title VI of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 252 (codified as amended at 42 U.S.C. §§ 2000d to 2000d–4 (1982), *see Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1250, 79 L.Ed.2d 568 (1984); *Baylor University*, 736 F.2d at 1042–43—federal funds are granted to students rather than directly to the program or activity itself. *Grove City*, 104 S.Ct. at 1220. The absence of direct funding to the college did not foreclose characterizing the relevant program or activity as one "receiving Federal financial assistance" under title IX.[28] Similarly, the fact that a respiratory therapy patient's Medicare or Medicaid payments are remitted first to Northwest and then to Lifetron does not launder those monies: the company is as much a recipient of these funds as the hospital, which would not have reaped that portion of its federally funded revenue but for the provision of services by Lifetron.[29]

---

**27.** The relevant clause reads in full:

> [Lifetron] will reimburse Hospital in the event certain disallowances should occur by third party payors for services delivered by [Lifetron] to Hospital's patients. Reimbursement shall include payment of only those monies previously paid by Hospital to [Lifetron] and such payment shall be dependent upon Hospital requesting such hearings, appeals, and other remedies as may be available to Hospital on all disallowances. Hospital further agrees to allow [Lifetron] to be present at all such hearings and recognizes that [Lifetron] will bear the expenses involved in such proceedings.

Record vol. 2, at 502.

**28.** The Department of Education's title IX regulations contain a definition of "recipient" that mirrors in all pertinent respects HHS's definition under section 504. *Compare* 34 C.F.R. § 106.2(h) (1984) *with* 45 C.F.R. § 84.3(f) (1984). *See Grove City*, 104 S.Ct. at 1215 n. 6.

**29.** Lest we be misconstrued, we do not hold that independent contractors who perform services for recipients of federal funds become recipients by virtue of a vicarious relationship through the primary recipient. Rather, we hold that the financial nexus of Lifetron to these Medicare and Medicaid funds is sufficiently close to render Lifetron itself a primary recipient of federal financial assistance.

This conclusion is not inconsistent with *Grove City*'s additional holding that title IX's program-specific language limits the reach of title IX to the program or activity actually in receipt of federal assistance. *See Grove City*, 104 S.Ct. at 1222; *see also North Haven Bd. of Educ. v. Bell,*

In addition, we note that the Secretary of Health and Human Services—the agency charged with administering section 504 as it relates to recipients of Medicare and Medicaid funds, *see* 29 U.S.C. § 794; 42 U.S.C. §§ 1301(a)(6), 1302—has defined "recipient" for purposes of section 504 to include "any public or private agency, institution, organization, or other entity ... to which Federal financial assistance is extended directly *or through another recipient.*" 45 C.F.R. § 84.3(f) (1984) (emphasis added).[30] We generally accord some deference, even great weight, to the statutory interpretations of agencies charged with administering a piece of legislation. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1254–55, 79 L.Ed.2d 568 (1984); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). As our discussion thus far should suggest, we find the Secretary's to be a reasonable interpretation of the statute under the circumstances of this case, and Lifetron falls squarely within its compass. Lifetron is a recipient of federal financial assistance under section 504 of the Rehabilitation Act.

## IV

Appellant argues that the district court erred in several other respects. First, that the court abused its discretion in dismissing appellant's pendent state claims for slander, libel, and tortious interference with contractual relations. Second, that the court abused its discretion by not allowing Frazier to file a supplemental complaint under Rule 15(d) against Lifetron, Northwest, Tony Nolan, and Northwest's nursing supervisor, Carol Williams, for their roles in suspending Frazier with pay despite the court's preliminary injunction requiring her temporary reinstatement. Third, that the court abused its discretion under Rule 60(b)(3) by not setting aside the judgment in favor of the Lifetron defendants on the section 504 claim because these defendants knowingly withheld information on discovery relevant to the financial relationship between Northwest and Lifetron. Fourth, that the court abused its discretion by not withdrawing under Rule 60(b)(6) [31] its Rule

456 U.S. 512, 102 S.Ct. 1912, 1926, 72 L.Ed.2d 299 (1982) (holding that "an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of [that title]"). In *Grove City*, students turned over their BEOG monies to the college's financial aid program, and it was this program, rather than the entire institution, that was therefore subject to title IX. The Court reasoned that there was no evidence that the grant funds were actually diverted to other areas of the school, that in general "it would be difficult, if not impossible, to determine which programs or activities derive such indirect benefits," and that it was unclear whether Congress had intended title IX "to follow federally aided students from classroom to classroom, building to building, or activity to activity." *Id.* 104 S.Ct. at 1221–22. By contrast, the Medicare and Medicaid funds in the present case are turned over directly to the institution, Northwest, of which Lifetron is a de facto subdivision. Thus, *Grove City's* program-specific rationale, which bridled at attributing the receipts of the part to the whole, is inapposite on the facts before us, where receipts of the whole are at issue, and where attribution flows in the opposite direction. Here, the whole, by dint of first receipt, comprises the sum of its parts.

**30.** Consistent with this provision, the regulations also state:

A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

45 C.F.R. § 84.4(b)(4). Section 84.4 clearly limits the extent to which a recipient such as Northwest can delegate certain functions to independent contractors such as Lifetron where the purpose or effect of such delegation would be to undermine the objectives of § 504.

**31.** Frazier also moved under Rule 59(e) for the district court to alter or amend its Rule 54(b) order. Motions filed pursuant to Rule 59(e), however, must be filed not later than 10 days after entry of the judgment from which relief is sought. Frazier's Rule 59(e) motion, filed some five months after the district court had ordered the entry of final judgment on behalf of the Northwest defendants, was therefore untimely.

54(b) direction for entry of final judgment in favor of the Northwest defendants. And finally, that the court abused its discretion by not granting Frazier an interim award of attorney's fees under 42 U.S.C. § 1988 after she had obtained a preliminary injunction based on her section 1983 claim. Having considered appellant's arguments on the first and second points, we conclude that the district court did not abuse its discretion either by dismissing the pendent state claims or by denying appellant's motion to file a supplemental complaint. As to the third point, our holding with regard to appellant's section 504 claim obviates the need to address this issue. We will devote some space, however, to appellant's fourth and fifth contentions.

 Our scope of review in evaluating the denial of a motion for relief from a final judgment under Rule 60(b)(6) is limited to the abuse-of-discretion standard. *E.g., Phillips v. Insurance Co. of North America,* 633 F.2d 1165, 1167 (5th Cir. 1981); *Fackelman v. Bell,* 564 F.2d 734, 736 (5th Cir.1977). Rule 60(b) states that "the motion shall be made within a reasonable time." In the present case, appellant's motion sought relief from the judgment in favor of the Lifetron defendants on the theory that that ruling was based upon the court's prior abuse of discretion in granting judgment for the Northwest defendants. Record vol. 2, at 414. To the extent this theory of transitive abuse is valid, it has no merit in the present case. Appellant waited over five months after the fact to object for the first time to the entry of final judgment on behalf of the Northwest defendants. If appellant wished to base her case against the Lifetron defendants on facts that were nonadjudicable by virtue of the final judgment against the Northwest

defendants, five months was hardly a "reasonable time" at which to contest the district court's Rule 54(b) order.[32] Relief from the Northwest defendants' final judgment should have been sought at the proper time, and if unsuccessfully, on appeal to this court. Appellant's failure to do so cannot now be remedied via a rule that is appropriately invoked only in "exceptional and compelling circumstances." 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.27[1], at 60–269 (2d ed. 1985). Rule 60(b)(6) is neither a direct nor a vicarious substitute for appeal, *see Fackelman,* 564 F.2d at 735–37, and the district court accordingly did not abuse its discretion in refusing to vacate either of its final judgments.

 With regard to appellant's claim for an interim award of attorney's fees under 42 U.S.C. § 1988,[33] we begin with the familiar observation that although the decision to award attorney's fees under section 1988 is within the discretion of the trial court, attorney's fees generally should be awarded to prevailing plaintiffs absent special circumstances. *Hensley v. Eckerhart,* 103 S.Ct. 1933, 103 S.Ct. 1933, 1937, 1939, 76 L.Ed.2d 40 (1983); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980); *Taylor v. Sterrett,* 640 F.2d 663, 669 (5th Cir.1981). The nature of "prevailing party" status has been expressed in a variety of ways, depending on the context in which the claim for attorney's fees arises. Often, "the proper focus is whether the plaintiff has been successful on the central issue as exhibited by the fact that he has acquired the primary relief sought," *id.* at 669; *see Iranian Students Association v. Edwards,* 604 F.2d 352, 353 (5th Cir.1979); at other times, we have stated that the lawsuit must

---

**32.** Appellant does not argue that the Rule 54(b) order constituted an abuse of discretion on the ground that the underlying summary judgment was itself improvidently granted.

**33.** The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, § 2, 90 Stat. 2641 (codified as amended at 42 U.S.C. § 1988 (1982)), provides in relevant part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, Title IX of Public Law 92–318, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

be a "substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior," *Robinson v. Kimbrough*, 652 F.2d 458, 466 (5th Cir.1981); *see also Hennigan v. Ouachita Parish School Board*, 749 F.2d 1148, 1151–52 & n. 9 (5th Cir.1985). Moreover, while a party does not attain prevailing-party status by virtue of any procedural victory during the course of a civil rights case, *see Ruckelshaus v. Sierra Club*, 463 U.S. 680, 103 S.Ct. 3274, 3279 n. 9, 77 L.Ed.2d 938 (1983), the Supreme Court has observed that "Congress contemplated the award of fees *pendente lite* in some cases." *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam). The Court continued:

> But it seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to *some relief on the merits of his claims, either in the trial court or on appeal.* ... It seems apparent ... that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims.

*Id.* at 757–58, 100 S.Ct. at 1989 (emphasis added). Appellant contends that she was entitled to an interim award of attorney's fees in light of the trial court's preliminary injunction returning her to work based in part on the likelihood of success on her section 1983 claim.

In *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981), we held that certain plaintiffs qualified as prevailing parties by having obtained a preliminary injunction on appeal. Because the decision to grant the preliminary injunction in *Deerfield Medical Center* subsumed an evaluation of the claimants' likelihood of success on the merits, *see id.* at 334–38, the plaintiffs had, by virtue of the preliminary injunction, "at least partially achieved the result sought in filing [their] action," *id.* at 339; *see also Davis v. City of Ennis*, 520 F.Supp. 262, 265–66 (N.D.Tex.1981) (per curiam) (three-judge court) (distinguishing between relief that is predicated on an adjudication on the merits and interim relief that merely forestalls injury pending final consideration on the merits), *cited with approval in Wooten v. Housing Authority*, 723 F.2d 390, 391 (5th Cir.1984) *and Smith v. Thomas*, 687 F.2d 113, 116 (5th Cir.1982). Similarly, the plaintiff in our case achieved some relief on the merits of her section 1983 claim when the trial court reinstated her at Lifetron pending the outcome of this litigation. This relief—coextensive in kind with the injunctive relief requested as part of appellant's original and amended complaints—was sufficient to establish appellant as a prevailing party at the time the relief was granted. *Kirchberg v. Feenstra*, 708 F.2d 991, 998 (5th Cir.1983); *Doe v. Marshall*, 622 F.2d 118, 120 (5th Cir.1980), *cert. denied*, 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981); *Iranian Students Association*, 604 F.2d at 353; *accord Williams v. Alioto*, 625 F.2d 845, 847 (9th Cir.1980) (per curiam), *cert. denied*, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); *cf. Laurenzo ex rel. Laurenzo v. Mississippi High School Activities Association, Inc.*, 708 F.2d 1038, 1042 (5th Cir. 1983) (per curiam) (noting that prevailing-party status based on preliminary injunction requires some determination of likelihood of success on merits).

Appellees contend, however, that the ultimate failure of Frazier's section 1983 claim in the district court, which we today affirm, negated the prevailing-party value that any preliminary relief may have had. While the district court's issuance of the preliminary injunction was based on its view of the law as it existed at the time, the Supreme Court subsequently decided two cases that led the district court ultimately to rule against plaintiff on her civil rights claim. Thus, on appellees' view, "Mrs. Frazier's initial success was based on a mistake of law which the District Court itself corrected." *Brief for Lifetron Appellees* at 27.

That a plaintiff eventually loses on the merits of a section 1983 claim does not

automatically undermine the validity of an interim attorney's fee award based on substantial relief that is granted in light of the then-current universe of legal principles. A plaintiff's prevailing-party status requires the district court to have passed favorably on the merits of the civil rights claim and to have granted relief that would not have been gained but for the litigation. These circumstances are present where, as here, the district court has decided to grant a preliminary injunction against the defendants, *Deerfield Medical Center*, 661 F.2d at 339, and where on appeal we have not repudiated the district court's preliminary evaluation of the merits of appellant's section 1983 claim under the law as it then stood. *See Kirchberg*, 708 F.2d at 998; *Marshall*, 622 F.2d at 120. More precisely, the issuance of a preliminary injunction is reviewable only for an abuse of discretion, *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 114 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980), and we cannot say that the court below abused its discretion in enjoining the defendants from demoting and discharging plaintiff under the law as it then existed.

*See* Part III *supra*. The statute simply does not contemplate that a plaintiff who attains prevailing-party status, and who is entitled to an interim fee award absent special circumstances, can later be divested of that status.[34] The very meaning of awarding interim attorney's fees in the course of litigation is to enable the civil rights plaintiff to press forward as a "private attorney general." *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 3–5, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5910–13.[35] If a defendant is aggrieved by the underlying issuance of injunctive relief against it, the appropriate remedy lies in noticing an interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). Beyond that, however, "[t]he purpose of section 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances," *Hensley*, 103 S.Ct. at 1937, and a subsequent change in law does not convert an otherwise "prevailing" civil rights plaintiff into a nonprevailing party.[36] Moreover, in light of the purpose of section 1988, we do not think that a change in law following the trial court's decision to grant

**34.** The situation of course bears no resemblance to cases where the party claiming attorney's fees has won no degree of success on the merits. *See, e.g., Ruckelshaus v. Sierra Club*, 463 U.S. 680, 103 S.Ct. 3274, 3281, 77 L.Ed.2d 938 (1983).

**35.** *Cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (noting, in context of discussing appropriateness of defendants' fee awards, that "it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."); *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam) (reasoning that "private attorney general"

concept underlying title II's private right of action requires award of attorney's fees to party who prevails in obtaining injunctive relief).

**36.** We recognize that our conclusion conflicts with that of the Eleventh Circuit in *Doe v. Busbee*, 684 F.2d 1375 (11th Cir.1982). In *Busbee*, the court held that an outcome-determinative change in law subsequent to the issuance of a preliminary injunction vitiated the significance of the injunctive relief for purposes of § 1988. Distinguishing *Deerfield Medical Center*, the Eleventh Circuit observed that in *Deerfield*, "it is clear that plaintiffs were prevailing parties [when they were granted their preliminary injunction]. However, in this case, plaintiffs have not ultimately prevailed on any legal issue, and any relief entered by the district court was awarded under a mistake of law." *Id.* at 1383. We read the holding in *Busbee* to be largely inconsistent with that in *Deerfield Medical Center*. The eventual resolution of the merits of a civil rights claim should not retroactively eradicate interim prevailing party status, since to hold otherwise would undo the utility of awarding attorney's fees *pendente lite*. Accordingly, we read *Deerfield Medical Center* to control appellant's prevailing-party status in this case.

a preliminary injunction alone constitutes "special circumstances" sufficient to justify not awarding interim attorney's fees to the prevailing plaintiff.

 However, plaintiff's prevailing-party status for purposes of obtaining an interim award of attorney's fees does not necessarily entitle her to the award. That decision remains within the discretion of the district court. On the record before us, it is unclear whether the trial judge's denial of attorney's fees stemmed from the belief that appellant was not a prevailing party under section 1988, or whether the denial was an exercise of discretion under the statute. We therefore remand this claim to the district court for a determination of whether the circumstances of this case, other than the intervention of new and relevant case law, render an interim award of attorney's fees unjust. *Cf. Kimbrough v. Arkansas Activities Association*, 574 F.2d 423, 427 (8th Cir.1978) (remanding for similar determination).[37] Absent such special circumstances, it will remain for the district court to determine what fee is reasonable. *See Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984); *Hensley*, 103 S.Ct. at 1939; *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974).

## V

Lifetron's relationship with Northwest is both enough and not enough to sustain appellant's claims. On the one hand, the contract between the two is a bipartite umbilical cord fed by Medicare and Medicaid funds such that Lifetron can be properly termed a recipient of federal financial assistance under section 504 of the Rehabilitation Act. On the other hand, the parameters limned by the Supreme Court, particularly in *Rendell-Baker v. Kohn*, constrain us to hold that the actions of this private defendant cannot be fairly attributed to the state for purposes of the under-color-of-law

requirement of section 1983. The apparent tension between these holdings is readily dissolved; as Liebniz once declared, *nihile est sine ratione* —there is nothing without its reason. The concepts of under-color-of-law and recipient status are informed by different considerations: the former comprises the state action requirements both of the Constitution and of section 1983, while the latter focuses more narrowly on the scope of the language employed by Congress to address the problem of discrimination based on handicap. Often, these considerations yield results that, while not geometrically congruent, are consistent. Because this is the situation before us, and because in other respects we do not take issue with the district court's rulings except with regard to attorney's fees, the judgment is

AFFIRMED IN PART and REVERSED AND REMANDED IN PART.

---

**37.** As we have stated, "Proper appellate review requires that any district court denying § 1988 attorney's fees to a prevailing plaintiff who notices an appeal should … set out the specific reasons justifying its action, in the form of written findings of fact and conclusions of law." *Kirchberg*, 708 F.2d at 1001.