**DAVIS OIL COMPANY, et al.,**
**Plaintiffs–Appellants,**

v.

**William P. MILLS, III, et al.,**
**Defendants–Appellees.**

**William P. MILLS, III, et al.,**
**Plaintiffs–Appellees,**

v.

**DAVIS OIL COMPANY, et al.,**
**Defendants–Appellants.**

No. 87–4940.

United States Court of Appeals,
Fifth Circuit.

May 15, 1989.
Rehearing and Rehearing En Banc
Denied June 14, 1989.

F. Henri Lapeyre, Jr., Matthew J. Randazzo, III, E. Burt Harris, New Orleans, La., for plaintiffs-appellants.

Kai David Midboe, Baton Rouge, La., for Guste.

Warren D. Rush, Lafayette, La., for Mills, Robertsons and Bridges.

Charles R. Minyard, Lafayette, La., for First Nat.

Before KING, JOHNSON and JOLLY, Circuit Judges.

KING, Circuit Judge:

## I.

Plaintiff-appellant Davis Oil Company appeals from the judgment of the district court holding that the Due Process Clause of the fourteenth amendment does not require that a foreclosing mortgagee provide

actual notice to a mineral lessee whose lease will, under Louisiana law, be extinguished by the seizure and sale of the subject property.

For the reasons set forth below, we affirm the judgment of the district court.

### A. *Facts*

The underlying facts of this case are largely undisputed and were found by the district court as follows.

In August of 1977, Kenneth Upton ("Upton") purchased a 16.43 acre tract of land (the "tract") located in Lafayette Parish, Louisiana. In May of 1983, Upton mortgaged the property as collateral for a $500,000 loan from defendant First National Bank of Lafayette ("FNB"). The collateral mortgage was properly recorded in the mortgage records of Lafayette Parish. The loan was intended to finance Upton's business, American Tools, Inc.

In November, 1983, Upton granted a mineral lease on the tract to Louisiana Land Management, Inc. ("LLM"). The lease was promptly recorded in the Lafayette Parish conveyance records. On January 30, 1984, LLM assigned the lease to plaintiff Davis Oil Company ("Davis"). This assignment was also promptly recorded.

Upton then defaulted on the loan and on other obligations to FNB in April, 1984. FNB filed suit against Upton and American Tools, Inc., alleging default on the mortgage encumbering the tract. Upton confessed judgment and waived all delays. The judgment reflected a total debt of $3,500,000 and recognized the mortgage affecting the property.

In execution of its judgment, FNB obtained a writ of *fieri facias*, ordering the Lafayette Parish Sheriff to seize property belonging to Upton. FNB targeted certain properties, including the land leased to Davis, for seizure and judicial sale. FNB was unaware of the mineral lease on the tract. On May 30, 1984, the Sheriff sold the land to FNB after obtaining a certificate of nonmortgage. A deed reflecting the sale was recorded in June, 1984. No

actual notice was afforded Davis although the judicial sale was advertised in compliance with article 2331 of the Louisiana Code of Civil Procedure.

On March 10, 1984, a Davis Oil Company well located on property adjacent to the subject tract "blew out," indicating a significant hydrocarbon discovery. In August, 1984, Davis assigned portions of its interest in the lease to Exxon Corporation, Grace Petroleum Corporation, NWT Natural Resources Company, Saturn Energy Company, and Allen E. Paulson (these various assignees will be included in references to "Davis"). These assignments were recorded in November, 1984.

In September, 1984, Davis gave notice that it planned to apply to the Commissioner of Conservation for the establishment of a production unit for Bayou Tortue Well No. 4, incorporating the subject tract. Because defendant William P. Mills III ("Mills") owned nearby property, he was provided with notice of this intent.

On October 31, 1984, Mills and FNB entered into a letter agreement in which FNB agreed to sell the subject tract to Mills. Negotiations continued over the warranty that FNB would deliver. In the interim, Mills obtained a title opinion which specifically questioned the validity of the sheriff's sale on the ground that the mineral lessee may not have received notice of the foreclosure.

On February 4, 1984, the Commissioner of Conservation signed an order incorporating a portion of the subject tract into the Bayou Tortue Well No. 4 production unit. This act guaranteed the subject tract a share in the production from the unit. On February 12, 1985, Mills, John L. Robertson, Brenda Sue Harmon Robertson, Orel Bridges, Jr., and Ethel Sue Hoffpauir Bridges (collectively included in references to "Mills") purchased the subject tract. The contract stipulated that the sale was subject to recorded leases. The sale was recorded the following day.

Davis filed suit in the Federal District Court for the Western District of Louisiana on July 1, 1985. Jurisdiction was based on the presence of a civil rights claim, 28 U.S.C. § 1343(a)(3) and diversity of citizenship, 28 U.S.C. § 1332. Davis sought a declaratory judgment that the sheriff's sale of the subject tract was invalid because Davis had not been provided with direct notice of the seizure and impending sale, in violation of the Due Process Clause. Second, Davis sought equitable relief for the increased value of the subject tract resulting from a well Davis had drilled on land adjacent to the tract and within the same production unit. Third, Davis sought a declaratory judgment that its lease could not, as a matter of Louisiana state law, be extinguished by a judicial sale enforcing FNB's judgment. Finally, Davis asked for a declaratory judgment that the subject tract, again as a matter of Louisiana state law, was burdened by the lease because Davis recorded its lease prior to the sale of the property to Mills and the contract between Mills and FNB provides that the tract is subject to prior recorded leases, thereby estopping Mills from asserting otherwise.[1]

### B. The District Court Opinion

The district court, after a trial on the briefs and documentary evidence, denied relief to Davis on all counts. First, the district court held that although the sheriff's sale constituted state action, and although the lease was a protected property interest, deprivation of which is subject to the constraints of the Due Process Clause, constructive notice was reasonable in this case. Second, the district court found that Davis was not entitled to equitable relief for any enhancement in the value of the subject tract because Davis had a statutory

---

1. Mills filed a petition in Louisiana state court on January 10, 1986, seeking cancellation of Davis' lease and damages for the defendants' alleged failure to pay Mills a share in the production from the unit that includes the disputed parcel of land. Mills' suit was removed to federal court on grounds of diversity of citizenship and was consolidated with Davis' lawsuit against Mills and FNB. The district court held that Mills' petition to cancel the lease was rendered moot by the court's decision that the Sheriff's sale was constitutionally sound and had extinguished Davis' lease on the subject tract of land.

remedy under section 30:5(C)(3) of the Louisiana Revised Statutes. Third, the district court found that as a matter of Louisiana law, Davis' lease was extinguished by the sale because the consent judgment obtained against Upton was properly considered a foreclosure by ordinary proceeding which extinguishes all subordinate obligations such as Davis' lease which was subsequent in time to the mortgage. Finally, the district court held that no concept of estoppel applied to prevent Mills from claiming that the subject tract was not burdened by the lease.

Davis filed a timely notice of appeal from the district court's judgment.

## C. *Claims on Appeal*

Davis argues on appeal that the district court erred in concluding that constructive notice of the seizure and sale of the subject property satisfied the requirements of due process.[2] Davis contends that its identity was easily and readily ascertainable from the conveyance records of Lafayette Parish and that absent an effort to provide Davis with actual notice of the sheriff's sale of the subject tract, the sale was constitutionally flawed at least insofar as it extinguished Davis' interest in the subject tract. Mills and FNB advance three arguments on appeal. First, they argue that the foreclosure did not constitute action under color of state law. Second, they contend that even if there was state action, Davis was not "deprived" of a legally protected property interest because its lease was subordinate to the mortgage—thus, the property interest was simply extinguished by operation of a legal condition. Finally, they assert that even if Davis was deprived of a legally protected property interest, constructive notice was sufficient to satisfy the requirements of due process because Davis failed to avail itself of Louisiana's

"request notice" provision, La.Rev.Stat. Ann. 13:3886 (West Supp.1988).

This case therefore presents three issues on appeal: first, whether the district court erred in finding state action, second, whether the district court erred in finding that Davis was deprived of a legally protected property interest and third, whether constructive notice satisfied the Due Process Clause. We address these issues in turn.

## D. *Standard of Review*

This action was submitted to the district court for trial on briefs and documentary evidence. The district court's findings of fact, although based solely on documentary evidence, are subject to the clearly erroneous standard of review. Fed.R.Civ.P. 52(a) & advisory committee's note (1985). Accordingly, we may not reverse the district court's factfindings unless we are left, after reviewing the entire evidence, "with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The district court's conclusions of law, however, are freely reviewable on appeal. *See Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982).

## II.

As a preliminary matter, it is useful to review the salient features of the Louisiana procedures that are at issue in this case.[3]

Louisiana law provides two means of enforcing a mortgage. La.Code Civ.P. art. 3721 (West 1961 & Supp.1988). When a mortgage contains a confession of judgment, a mortgagee may foreclose on the mortgage through executory process which is an action *in rem*. *Id*. art. 2631. The mortgagee must file a petition to enforce

---

**2.** Davis does not challenge on appeal any of the district court's state law holdings. Although Davis does maintain that its lease was not extinguished by the Sheriff's sale, its argument on appeal is based solely on the Due Process Clause and not on Louisiana state law. Our opinion therefore addresses only the constitutional issues.

**3.** For a more detailed description of Louisiana's procedures, see Rubin & Carter, *Notice of Seizure in Mortgage Foreclosures and Tax Sale Proceedings: The Ramifications of Mennonite*, 48 La.L.Rev. 535, 541–44 (1988).

the mortgage, requesting the seizure and sale of the subject property. *Id.* art. 2634. The judge reviews the petition and supporting documents, *id.* arts. 2635–37, and orders the issuance of a writ of seizure and sale, commanding the sheriff to seize and sell the property affected by the mortgage. *Id.* art. 2638. The statutory scheme for executory proceedings includes no express requirements of actual notice,[4] except that the debtor is entitled to written notice of the seizure of the subject property—after the judgment has been rendered. *Id.* art. 2721. The only other notice required is the advertisement of the sheriff's sale. *Id.* art. 2722.

If the original mortgagor has sold the property to a third party, the mortgagee may nevertheless enforce the mortgage, by executory process, directly against the property, without regard to the alienation of the property to a third party.[5] *Id.* art. 2701 (creating a statutory *pact de non alienando* for all mortgages containing a confession of judgment). In the case of executory proceedings, there is no statutory requirement that the present owner receive notice of the seizure. *Id.* art. 2721; *but see Bonner v. B–W Utilities*, 452 F.Supp. 1295, 1302 (W.D.La.1978) (third possessor whose name and address were known to mortgagee was constitutionally entitled to notice of seizure).

Alternatively, if the mortgage does not contain a confession of judgment, the mort-gagee must first obtain a money judgment against the mortgagor. Thus, an ordinary proceeding differs from an executory proceeding in that the mortgagor must be made a party to the action and must therefore receive notice of the foreclosure proceeding itself. La.Code Civ.P. art. 1201 (West 1984 & Supp.1988). The judgment is then executed by a writ of *fieri facias* under which the sheriff of the parish will seize and sell the mortgagor's property to satisfy the judgment. *Id.* art. 2291. A mortgagee may enforce a judgment obtained by ordinary process without reference to any alienation or transfer of the property, *id.* art. 3741 (also creating statutory *pact de non alienando*), but both the original mortgagor and the present owner of the property are entitled to notice of the seizure.[6] *Id.* art. 3742. The only other notice expressly required by statute is again the advertisement of the sheriff's sale. *Id.* art. 2331 (notice of sale of property under writ of *fieri facias*).

The effect of a sale pursuant to foreclosure by either method[7] is to extinguish all inferior encumbrances upon the property.[8] *Id.* art. 2376. The property is sold, however, subject to any real charge or lease *superior* to the mortgage of the seizing creditor. *Id.* art. 2372.

Finally, an additional feature of the Louisiana scheme is the so-called request-notice provision contained in Revised Statute

---

**4.** The sheriff is required to issue a demand for payment three days before the writ of seizure and sale is issued, but the mortgagor may waive the right to receive the demand for payment. La.Code Civ.P. arts. 2639–40.

**5.** Such third parties do, however, have a statutory right to enjoin the sale and to retire the indebtedness. La.Code Civ.P. arts. 2702–03 (rights, respectively, of those who buy property subject to a mortgage (without assuming the debt) and those who purchase the property and assume the debt); *see also infra* note 6.

**6.** Third parties claiming ownership are, like the judgment debtor, entitled to enjoin the sale of the property on specified grounds. La.Code Civ.P. art. 2298 (West Supp.1988). In an ordinary proceeding, third persons asserting a mortgage or privilege—whether superior or inferior to that of the seizing creditor—may also intervene at any time prior to the sale and seek to enjoin the sale until their claims are adjudi-cated. *Id.* art. 1092 (West 1984). When a judgment obtained under either ordinary or executory process is sought to be enforced against a third party in possession of the property, the third possessor is authorized by statute to arrest the seizure (on specified grounds) and to retire the balance of the indebtedness. *Id.* art. 3743 (West 1961) (containing cross reference to article 2703).

**7.** Article 2724 provides that a sale of property under a writ of seizure and sale issued in an executory proceeding is governed by the same provisions which apply to a sale under a writ of *fieri facias.*

**8.** Inferior creditors are to be paid out of the sale proceeds, after costs are deducted, and the seizing creditor has been paid. La.Code Civ.P. arts. 2373, 2377 (West 1961).

13:3886. La.Rev.Stat.Ann. 13:3886 (West Supp.1988). Under RS 13:3886, any person may obtain notice by mail of the seizure of immovable property by paying a ten dollar fee and placing his or her name and address on file in the mortgage records of the Parish where the property is located. One question before us in this case is the extent to which RS 13:3886 cures any constitutional defects in Louisiana's constructive notice provisions.

We proceed now to the issues presented on appeal.

### A. *Color of State Law*

FNB maintains that the district court erred in finding that FNB, a private party, acted under color of state law in foreclosing on Upton's property and in executing its judgment.

To state a cause of action under 42 U.S. C. § 1983, a plaintiff must allege first, that he or she has been deprived of a right "secured by the Constitution and laws" of the United States, and second, that the deprivation was by a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State...." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Daniel v. Ferguson*, 839 F.2d 1124, 1128 (5th Cir.1988); *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center*, 765 F.2d 1278, 1283 (5th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986); *Roberts v. Louisiana Downs*, 742 F.2d 221, 223 (5th Cir.1984).

For a party to be subject to suit under section 1983, the asserted deprivation of rights must stem from conduct fairly attributable to the state. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). This requirement, "whether good or bad policy," reflects a basic tenet of our politi-

cal order that "most rights secured by the Constitution are protected only against infringement by governments" and not by private parties. *Id.* at 936–37, 102 S.Ct. at 2753–54 (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978)); *Frazier*, 765 F.2d at 1283.

The actions of a private party may therefore be attributed to the state only if two conditions are met:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753; *Daniel*, 839 F.2d at 1130.

Although a myriad of tests have been applied to determine whether a party acts under color of state law, we think that Davis' claims are sufficiently analogous to the prejudgment attachment cases to fall under the "joint participation" test applied in *Lugar*.[9] *See Lugar*, 457 U.S. at 939, 102 S.Ct. at 2755.

The plaintiff in *Lugar* alleged that he had been deprived of his property without due process of law when a private creditor sought and obtained prejudgment attachment of his property pursuant to a Virginia statute. The writ of attachment had been executed by the County Sheriff. The Court concluded that insofar as the plaintiff alleged only that his creditor had invoked the attachment statute without sufficient grounds to do so, he did not state a cause of action under section 1983. To the extent, however, that the plaintiff challenged the attachment procedure as defective under the fourteenth amendment, the

---

9. The prejudgment attachment cases are obviously not apposite insofar as Davis was not a debtor of FNB. These cases *are* analogous, however, insofar as Davis' central contention is that the Louisiana procedure provides for the termination of all subordinate interests in the subject property, without requiring constitution-

ally adequate notice to the holders of such interests. As we discuss more fully below, any distinction between Davis' claims and those of a debtor subject to a prejudgment attachment statute turns not on the nature of the underlying constitutional claim, but on the nature of the property interest at stake.

Court found that he did state a valid cause of action. *Id.* at 940–41, 102 S.Ct. at 2755–56.

The Court reasoned that "[w]hile private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action." *Id.* at 941, 102 S.Ct. at 2756. The Court found that the procedural scheme "is subject to constitutional restraints" and may be addressed in a section 1983 action, as long as the second requirement—that the defendant "may fairly be said to be a state actor"—is also met. *Id.* The Court noted that it had "consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Id.* The Court then concluded that "[w]hatever may be true in other contexts," joint participation does not require more than invoking the aid of state officials, "when the State has created a system whereby state officials will attach property on the *ex parte* application of one party to a private dispute." *Id.* at 942, 102 S.Ct. at 2756; *see also North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (state-created garnishment procedure); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (execution of vendor's lien to secure disputed property); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (state-created prejudgment replevin procedure); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (state-created garnishment procedure).

To the extent that *Lugar* adopts a low threshold to establish joint participation between a private party and the state, its holding has been confined to the context of ex parte prejudgment proceedings.[10] *Lu-*

*gar,* 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21 ("The holding today, as the analysis makes clear, is limited to the particular context of prejudgment attachment."); *Earnest v. Lowentritt,* 690 F.2d 1198, 1201 (5th Cir.1982).

In claiming that FNB did not act under color of state law, defendants rely primarily on *Earnest v. Lowentritt,* in which we held that the "[i]nitiation of foreclosure proceedings pursuant to a mortgage implicates no ... authority of state law." 690 F.2d at 1201.

In *Earnest,* we distinguished the mortgage foreclosure at issue from the pre-adjudicative seizures discussed in *Lugar* and noted that the execution order permitting the sheriff to sell the Earnest property was obtained after the debtor had been given notice of the impending seizure and an opportunity to be heard on the merits of the seizure. Because the proceeding at issue in *Earnest* could not be characterized as ex parte, the mere invocation of state procedures by a private party was not sufficient to establish state action. *Id.* at 1201–02. We cautioned that a contrary holding would "transform every foreclosure action between private parties into state action of constitutional dimension." *Id.* at 1202.

■ This case, however, does not present the same issue. In arguing that *Earnest* is controlling here, defendants fail to recognize that it is Upton, rather than Davis, who stands in the shoes of the Earnest plaintiffs. Although the foreclosure was not ex parte with respect to Upton (who received notice and did not contest the foreclosure), the gravamen of Davis' complaint is that the Louisiana procedure allows foreclosure and the execution of a judgment pursuant to foreclosure without providing constitutionally adequate notice to other parties whose interests in the property will be extinguished along with the

**10.** We recently noted, however, that in *Pennzoil v. Texaco,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), four justices were willing to find state action in a private party's invocation of a state's postjudgment collection procedures. *Howard Gault Co. v. Texas Rural Legal Aid, Inc.,* 848 F.2d 544, 553 (5th Cir.1988).

Justices Brennan, Marshall and Blackmun all agreed with the portion of Justice Stevens' concurring opinion that would have found state action. *Pennzoil,* 481 U.S. at 19, 27, 107 S.Ct. at 1530, 1534 (Brennan, & Blackmun, JJ. concurring); *id.* at 30 & n. 1, 107 S.Ct. at 1536 & n. 1 (Stevens & Marshall, JJ. concurring).

debtor's by the seizure and sale of the property. Thus, as the district court noted, Davis' claim is precisely that the procedure is ex parte with respect to parties in its position.

We agree with the district court that insofar as Davis challenges the constitutionality of the Louisiana procedure on these grounds, FNB may be considered a "joint participant" with the state because it set into motion the procedures that would extinguish Davis' interest in the subject property.[11] *See Folsom Investment Co. v. Moore,* 681 F.2d 1032, 1037 (5th Cir.1982) (applying *Lugar* but adopting qualified immunity from monetary damages for parties who seek to secure their rights under a presumptively valid attachment statute). Similarly, although we have suggested that establishing action under color of state law may not always be sufficient to establish state action for purposes of the fourteenth amendment, we conclude that this case is sufficiently similar to *Lugar* itself to find both elements.[12] *See Frazier,* 765 F.2d at 1283 & n. 7.

**11.** A holding to the contrary would require us to ignore the nature of Davis' constitutional claim. If we were to hold that FNB did not act under color of state law with respect to Davis, we would effectively hold that the only person who may maintain a section 1983 suit challenging the constitutionality of a private creditor's seizure or sale of property is the debtor—when the plaintiff's complaint is precisely that the state may not permit the termination of other interests in the disputed property without requiring adequate notice to those interest holders. This question is more properly addressed by considering whether Davis in fact had a property interest protected by the fourteenth amendment, rather than subsuming the question in the state action inquiry.

**12.** The Court cautioned in *Lugar* that "under color of any statute" should not be read "in such a way as to impose a limit on those Fourteenth Amendment violations that may be redressed by the § 1983 cause of action." 457 U.S. at 934, 102 S.Ct. at 2752. Relying on the legislative history of the Civil Rights Act of 1871, the Court emphasized that Congress intended the remedies available under § 1983 to be coextensive with the protections of the fourteenth amendment. *Id.*

On the other hand, the Court noted that "[i]f action under color of state law means nothing more than that the individual act 'with the knowledge of and pursuant to that statute,' ... then clearly under *Flagg Brothers* that would not, in itself, satisfy the state-action requirement of the Fourteenth Amendment." *Id.* at 935 n. 18, 102 S.Ct. at 2752 n. 18 (citation omitted). This case, however, like *Lugar,* may be distinguished from *Flagg Brothers.*

In *Flagg Brothers,* the Court found that the private defendants did not act under color of state law in threatening to sell the plaintiffs' property pursuant to U.C.C. § 7–210. *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The plaintiffs in *Flagg Brothers* argued that in authorizing private storage companies to sell stored goods in satisfaction of delinquent accounts, the state had delegated a traditionally public function to private entities. *Id.* at 157, 98 S.Ct. at 1734.

The Court found that "the settlement of disputes between debtors and creditors is not traditionally an exclusive public function." *Id.* at 161, 98 S.Ct. at 1736. Similarly, the Court found that New York had not compelled the sale of the disputed property but had simply outlined the circumstances "under which its courts will not interfere with a private sale." *Id.* at 166, 98 S.Ct. at 1738.

*Flagg Brothers* itself, however, distinguished the Court's earlier prejudgment attachment cases. *Id.* at 160 n. 10, 98 S.Ct. at 1735 n. 10. In this case, as in *Lugar* and the other prejudgment attachment cases, the claim is not simply that the private defendant acted "with the knowledge of and pursuant to" the state procedural scheme in conducting a private sale. Under the Louisiana procedure, the sheriff seizes the property and advertises and conducts the sale. State law provides that property sold pursuant to this procedure will pass, free of all junior encumbrances, to the purchaser. *See supra* (description of Louisiana foreclosure procedures). Thus the state not only provides the legal framework whereby other interests in the subject property are terminated, it also is "intimately involved" with the execution of the procedures which accomplish the termination of such interests. This is sufficient to establish state action for purposes of the fourteenth amendment. *See Tulsa Professional Collection Services v. Pope,* 485 U.S. 478, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988).

For the reasons set forth in the text, we do not believe that this holding is inconsistent with cases that have not found state action in nonjudicial foreclosures by private parties. *See Barrera v. Security Building & Investment Corp.,* 519 F.2d 1166, 1174 (5th Cir.1975) (finding no state action in nonjudicial foreclosure under Texas statute); *Mildfelt v. Circuit Court of Jackson County, Missouri,* 827 F.2d 343, 346 (8th Cir. 1987) (no state action in extrajudicial foreclosure where Missouri law simply recognized validity of contractual power of sale provisions). The arguably ex parte character of the procedures, combined with the extensive involvement of state officials, is sufficient to establish state action where it would not otherwise be found.

782

## B. *Protected Property Interest*

■  Although the defendants do not dispute that a mineral lease is a legally protected property right under Louisiana law,[13] they argue on appeal that Davis was not "deprived" of that right within the meaning of the Due Process Clause of the fourteenth amendment.

Defendants rely on the axiom that property interests "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). They argue that the "dimensions" of property rights in a leasehold are defined by Louisiana law to terminate upon judicial sale of the property pursuant to a foreclosure on a mortgage superior to the lease. *T.D. Bickham Corp. v. Hebert,* 432 So.2d 228, 230 (La.1983). Defendants contend that the termination of property rights, consistent with the limitations to which the right is subject, is not a deprivation of property within the meaning of the fourteenth amendment.

In support of this argument, defendants rely primarily on *FDIC v. Morrison*—an Eleventh Circuit case in which the court held that although a mortgagor's equity of redemption is a legally protected property right, "[f]oreclosure within the contractual terms and the requirements of Alabama law did not deprive [the mortgagor] of his equity of redemption, but only terminated it." 747 F.2d 610, 615 (11th Cir.1984), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The court reasoned that where the state simultaneously grants a property right and subjects that right to substantive limitations, the right must be defined in terms of its limitations. *Id.* at 615 n. 10. The court found that the equity

of redemption is defined by Alabama law to exist only up to the moment when the mortgagee exercises the power of sale and concluded that "[b]ecause foreclosure and the equity of redemption cannot overlap, it is impossible that this foreclosure infringed on Morrison's right." *Id.* at 615. Morrison was therefore not entitled to notice of the impending sale of the subject property. *Id.* at 616.

Similarly, defendants argue, Louisiana law ranks property interests chronologically, according to the date that an interest is recorded and provides clearly that subordinate property interests will be canceled by a superior creditor's foreclosure on the property. *See supra* (summary of Louisiana foreclosure procedure). Furthermore, "[a]ll persons are held to have constructive notice of the existence and contents of recorded instruments affecting immovable property." *Judice–Henry–May Agcy. Inc. v. Franklin,* 376 So.2d 991, 992 (La.App. Cir. 1 1979), *writ. ref'd,* 381 So.2d 508 (La.1980). Defendants contend that Davis was therefore charged with notice of the mortgage in favor of FNB which was recorded at the time the mineral lease was executed. Defendants note that Davis could have negotiated with FNB to subordinate the mortgage to the mineral lease. Because Davis failed to do so, however, its rights in the leasehold were limited from their inception by the existence of a superior mortgage. Defendants conclude that as in *Morrison,* FNB's foreclosure therefore did not "deprive" Davis of any property right within the meaning of the fourteenth amendment, but simply terminated the right consistent with the conditions to which the lease was subject.

The Eleventh Circuit's reasoning in *Morrison* illustrates the persistent difficulty of defining the rights in property that are

Because we read Davis' claim to be essentially analogous to the Court's prejudgment attachment cases, we do not need to reach the question of when action "under color of state law" would not also be state action for fourteenth amendment purposes. Both elements are present here.

13.  Under Louisiana law, mineral rights are "real" rights and the owner "may assert, protect, and defend his right in the same manner as the ownership or possession of other immovable property." La.Code Civ.P. art. 3664 (West Supp. 1988); *see also* La.Rev.Stat.Ann. § 31:16 (West 1989).

subject to constitutional protections.[14] Although the Supreme Court has recognized that the states have broad power to create and define the scope of property rights, the Court has also recognized that a purely positivist view of property rights threatens to render the Due Process Clause meaningless.

Three justices pressed the positivist notion of state-created property rights to its logical limits in *Arnett v. Kennedy,* arguing that "where the grant of a substantive right is inextricably interwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." 416 U.S. 134, 153–54, 94 S.Ct. 1633, 1643–44, 40 L.Ed.2d 15 (1974) (opinion of Rehnquist, J.).

The "bitter with the sweet" approach was resoundingly rejected, however, by a majority of the court in subsequent cases:

> [I]t is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee.... The point is straightforward: the Due Process Clause provides that certain substantive rights —life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by

the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest ..., it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."

*Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985) (quoting *Arnett,* 416 U.S. at 167, 94 S.Ct. at 1650 (Powell, J., concurring in part and concurring in result in part)); *see also Logan v. Zimmerman Brush,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155–56, 71 L.Ed.2d 265 (1982) (adherence to "bitter with the sweet" approach would allow the State to destroy at will virtually any state-created property interest); *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) (minimum procedural protections afforded by the Constitution are not diminished by fact that State provides its own procedures).

Although the Eleventh Circuit in *Morrison* attempted to avoid the trap of *Arnett* by characterizing the limitation at issue as substantive rather than procedural, 747 F.2d at 615 n. 10, we do not find their reasoning entirely persuasive in the context of this case.[15]

---

**14.** *See* L. Tribe, American Constitutional Law §§ 9–7, 10–8–12 (1988); Flax, *Liberty, Property, and the Burger Court: The Entitlement Doctrine in Transition,* 60 Tulane L.Rev. 889 (1986).

**15.** Although the Court has held that where the state alters the substantive definition of property rights, the legislative determination may provide all the process that is due, *Logan,* 455 U.S. at 432–33, 102 S.Ct. at 1155–56, the state's power to alter the substantive definition of property rights is not without limitation.

In *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* the Supreme Court invalidated as an unconstitutional taking a Florida statute which authorized the county clerk to invest moneys deposited with the registry of the court in interest-bearing accounts and provided that all interest accruing from such deposits would be deemed the property of the office of the clerk of the court. 449 U.S. 155, 164, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980). The state reasoned that without statutory authorization to invest regis-

try deposits in interest-bearing accounts, the deposit would have earned no interest at all—thus, the state took only what it created. *Id.* at 158, 101 S.Ct. at 449. While the Court acknowledged that apart from the statute, there was no requirement that interest be earned on a registry deposit, it rejected the state's contention that it was therefore entitled to assume ownership of the interest. *Id.* at 162, 101 S.Ct. at 451.

The Court noted that the principal deposited in the registry "plainly was private property," and emphasized that "[t]he usual and general rule" is that interest follows the principal. *Id.* at 160, 162, 101 S.Ct. at 450, 451. The Court concluded that the state's attempt to alter the traditional understanding that "earnings of a fund are incidents of ownership of the fund" violated the Taking Clause of the fifth amendment: "a State by *ipse dixit,* may not transform private property into public property without compensation." *Id.* at 164, 101 S.Ct. at 452.

The simple act of labeling a condition "substantive" does not eliminate due process concerns. At some point, to hold that no due process attaches to the operation of a "substantive" condition that terminates a property right is to define the scope of that property right by the *absence* of procedural protections attendant upon its termination. This too reduces the due process clause to a tautology.

Moreover, to apply the Eleventh Circuit's reasoning to this case would extend *Morrison* far beyond its original context. The court emphasized in *Morrison* that "[t]he blame for turning the once-hypothetical foreclosure into reality lies solely with the mortgagor." 747 F.2d at 615. In other words, it was the mortgagor's own default which set into motion the condition which terminated his equity of redemption. The defendants' argument here would lead to the conclusion that any subordinate property interest is, in effect, "conditioned" by the existence of superior interests in the property. On this logic, a foreclosure that terminates subordinate interests would never "deprive" the inferior interest holder of property within the meaning of the fourteenth amendment.[16] An inferior interest holder, however, has no control over the property owner's default on a superior obligation and thus no control over the *operation* of the condition to which his or her interest is subject. Therefore, even if the ranking of property interests according to the Louisiana statutory scheme alters the substantive definition of those rights, we decline to hold that due process does not

attach to a foreclosure by a party holding a superior interest in the property.

The Supreme Court has not allowed the State's power to impose conditions on property rights to encroach this far on the protections afforded by the Due Process Clause. Rather, the circumstances in which the termination of a property interest by operation of a legal condition does not trigger due process concerns are limited.

In *Texaco Inc. v. Short*, for example, the Court upheld an Indiana statute which provided that a severed mineral interest which was unused for a period of 20 years would lapse and revert to the surface owner, unless the mineral owner filed a statement of claim in the county recorder's office. 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). The Court noted that a state may "condition the retention of a property right upon the performance of an act within a limited period of time." *Id.* at 529, 102 S.Ct. at 792. The Court then rejected the plaintiffs' argument that a mineral interest could not be extinguished absent advance notice that a 20–year period of nonuse is about to expire. *Id.* at 538, 102 S.Ct. at 797. The Court emphasized the "difference between the self-executing feature of the statute and a subsequent judicial determination that a particular lapse did in fact occur." *Id.* at 533, 102 S.Ct. at 794. While due process constraints, including the requirement of adequate notice to the mineral owner, would apply to a subsequent quiet title action "that would determine conclusively that a mineral interest has reverted to the owner," they did not attach to the operation of the statutory condition it-

---

**16.** Two commentators discussing the implications of *Mennonite* for Louisiana's mortgage foreclosure scheme advance an argument similar to defendants' argument. They note that a tax sale—the procedure at issue in *Mennonite*—is different from ordinary foreclosure proceedings precisely because it does upset the state-defined ranking of property interests:

> *Mennonite* addressed a taxing authority's actions that caused erasure of otherwise *superior* liens and encumbrances—a situation that cannot arise in conventional foreclosures. One could contend that *Mennonite*'s holding is limited to situations where the state "bootstraps" itself into a superior ranking position. In that instance, absent notice, a mortgagee

> has no way of knowing when the security interest may be affected, because pre-loan precautions in obtaining a title opinion (or title insurance) and checking the mortgage records will not suffice to protect against subsequent tax sales. An inferior lien holder, on the other hand, can determine whether it will be primed by private party superior liens. Since property rights generally are created by state law, and state law can dictate which rights are given superior preference, one can argue that an inferior mortgagee in effect "assumes the risk" that its mortgage not only may be primed but also may be extinguished by a foreclosing superior lienholder.

Rubin & Carter, *supra* note 3, at 549 (1988).

self which the Court compared to a self-executing statute of limitations. *Id.* at 534–36, 102 S.Ct. at 794–96. The Court concluded that an individual need not be given advance notice of the operation of a rule of law that applies uniformly to all citizens and clearly delineates the conditions on which a property interest may be terminated.[17] *Id.* at 537, 102 S.Ct. at 796; *see also County Line Joint Venture v. Grand Prairie, Texas,* 839 F.2d 1142, 1146–47 (5th Cir.) (relying on *Short* to uphold city ordinance that provided for automatic termination of special use permits that were not used for period of six months where administrative procedures would allow final determination on the merits), *cert. denied,* — U.S. ——, 109 S.Ct. 223, 102 L.Ed.2d 214 (1988).

The Supreme Court has recently made clear, however, that the seductively simple reasoning of *Short* may not be broadly applied to erode due process rights.

In *Tulsa Professional Collection Services v. Pope,* the Court distinguished *Short* from a case involving a provision of Oklahoma's probate laws which required that claims "arising upon a contract" be presented to the executor of a decedent's estate within two months of the publication of a notice advising creditors of the commencement of probate proceedings. 485 U.S. 478, 108 S.Ct. 1340, 1341–42, 99 L.Ed. 2d 565 (1988). A creditor whose claim was barred as untimely under the nonclaim statute challenged the provision, arguing that notice by publication did not satisfy the requirements of the Due Process Clause. The Oklahoma Supreme Court upheld the provision on the ground that such nonclaim statutes were self-executing statutes of limitation which did not require actual notice to parties whose property interests could be terminated by the operation of the statute.

The Supreme Court reversed the Oklahoma court, holding that because the Oklahoma nonclaim statute was set into motion by probate proceedings, it could not properly be considered "self-executing." *Id.* 108 S.Ct. at 1345. The Court clarified the distinction it had drawn in *Short* between the self-executing feature of the Indiana statute and a final, judicial determination of the mineral owner's rights in a subsequent quiet title action: "Where the legal proceedings themselves trigger the time bar, even if those proceedings do not necessarily resolve the claim on its merits, the time bar lacks the self-executing feature that *Short* indicated was necessary to remove any due process problem." *Id.* at 1346.

Although the time limit on the creditor's claim in *Pope* could probably not be considered a part of the substantive definition of that property interest, *Pope* indicates that the crucial factor in determining whether due process applies to the termination of a property interest is not whether the condition is labeled substantive or procedural, but the means by which the condition is set into motion. Even if a property interest is subject to a "substantive" condition from its inception, the operation of that condition may still constitute a deprivation of property to which due process attaches if the "condition" is not self-executing.

---

17. In *United States v. Locke* the Court upheld an analogous provision of the Federal Land Policy and Management Act ("FLPMA") which established a recording system for mining claims on federal lands and provided that claims would be deemed abandoned if the claimant failed to register the claim initially with the Bureau of Land Management or failed to file with state officials each year thereafter a notice of intention to hold the claim and an affidavit or report regarding work performed on the claim. 471 U.S. 84, 86–89, 105 S.Ct. 1785, 1788–90, 85 L.Ed. 2d 64 (1985). Noting that "BLM does provide for notice and a hearing on the adjudicative fact of whether the required filings were actually made," the Court held that due process did not require individualized notice of the filing deadlines. *Id.* at 109 & n. 17, 105 S.Ct. at 1800 & n. 17.

The Court also noted that "[i]n the exercise of its administrative discretion," BLM had for the past several years elected to mail annual reminders to claimants. 471 U.S. at 109 n. 18, 105 S.Ct. at 1800 n. 18. The Court otherwise evaluated the recording scheme, as a regulation of private property rights, under a rational basis test and determined that although individualized notice might be a more rational and desirable means of administering the scheme, Congress was free to choose *a* rational means of accomplishing its objectives. *Id.* at 109–10, 105 S.Ct. at 1800–01.

The self-executing statute at issue in *Short* did not implicate due process concerns precisely because the statute itself clearly delineated various conditions with which a mineral owner had to comply in order to maintain his or her property rights and also specified that failure to comply with those conditions would result in the termination of those interests. *Short,* 454 U.S. at 537, 102 S.Ct. at 796. The statutory scheme for ranking property interests under Louisiana law cannot, however, be considered a self-executing condition on property rights. Although parties are charged with notice that their property interests are subject, by virtue of the recording scheme, to superior interests and may be terminated by a superior claimant's foreclosure on the subject property, the nature of the "condition" is necessarily uncertain. Like the nonclaim provision at issue in *Pope,* the code section which provides for the termination of subordinate property interests is triggered by the legal proceedings themselves. Most importantly, the legal proceedings, both in this case and in *Pope,* were not, as in *Morrison,* triggered by the interest holder's *own* ac-

tions.[18] Thus, although the ranking of property interests pursuant to the recording system is a rule of general application, its operation is not the predictable result of the interest holder's own failure to comply with a specific requirement for the retention of her rights. We therefore cannot conclude that the subordination of a property interest is the sort of legal condition which falls outside the ambit of the Due Process Clause.

*Pope* also makes clear that a property interest may be "adversely affected" by a legal proceeding, thus triggering due process concerns, even if the proceedings at issue will not "adjudicate the merits" of the asserted property interest: "[I]t is irrelevant that the notice seeks only to advise creditors that they may become parties rather than that they are parties, for if they do not participate in the probate proceedings, the nonclaim statute terminates their property interests." 108 S.Ct. at 1346.

It is therefore immaterial that Davis' mineral lease was not itself the object of the foreclosure.[19] It is enough that Davis'

---

**18.** The nature of the condition's uncertainty is therefore different here than in *Morrison.* The court in *Morrison* stated that the fact that the "moment" of foreclosure was undetermined when the parties signed the mortgage "did not nullify the conditional nature of [the] equity of redemption." 747 F.2d at 615. However, as the court pointed out, the uncertainty was ultimately within the interest holder's own control. *Id.*

Because the instant case may be distinguished from *Morrison* on this ground, we need not address further the possible effect of *Pope* on the validity of the Eleventh Circuit's reasoning in *Morrison.*

**19.** We note that Louisiana law does not appear to give lessees any specific, statutorily-defined rights with respect to foreclosure proceedings.

In contrast, third parties who have purchased the property "subject to" a mortgage (without assuming the debt) or who have purchased the property and "assumed" the debt have statutorily-defined rights with respect to foreclosure proceedings and execution of a foreclosure judgment. *See supra* (summary of Louisiana foreclosure procedure).

It does not appear that a mineral lessee would be considered a third possessor under Louisiana law. *See In re Union Central Life Ins. Co.,* 208 La. 253, 23 So.2d 63, 71 (1945) (third possessor is someone other than a mere tenant, a trespasser, or one having only physical possession);

*Penn v. Citizens' Bank of Louisiana,* 32 La.Ann. 195 (1880). Although a mineral lease is considered to be a "real" right, *see supra* note 13, this designation does not give the mineral lessee greater substantive rights in realty than an ordinary lessee. *Arnold v. Sun Oil Co.,* 218 La. 50, 48 So.2d 369 (1950).

Similarly, parties claiming a mortgage or privilege on the property may intervene in a foreclosure by ordinary proceeding in order to ensure that their claims are included in the distribution of proceeds from the sheriff's sale. La.Code Civ.P. art. 1092. It is unclear whether a lessee would be entitled to intervene under this provision. It could therefore be argued that because a lessee's statutory rights with respect to a foreclosure are more limited than those of other interest holders, a lessee's rights are even more conditional. *See Bonner,* 452 F.Supp. at 1299–1300 (relying in part on existence of third possessor's statutory right to arrest proceedings to hold that third possessor whose name and address are known to mortgagee is entitled to notice of seizure in foreclosure by executory process).

However, even if the only benefit that a lessee would gain from receiving notice is the opportunity to bid at the sheriff's sale, that opportunity is not insignificant given that the lessee's property interest would otherwise be terminated altogether by the sale. Accordingly, we do not

property interest, along with the mortgagor's, would be extinguished by the foreclosure.

We therefore hold that the termination of Davis' lease by FNB's foreclosure and the subsequent seizure and sale of the subject property "deprived" Davis of a legally protected property interest within the meaning of the fourteenth amendment.

### C. *Constitutionally Adequate Notice*

Having held that the foreclosure was subject to the constraints of the Due Process Clause because Davis was deprived of a legally protected property interest by action under color of state law, we must now decide whether the requirements of due process were satisfied by advertising the sale of the subject property in a local newspaper.

Invoking the broad language of *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), Davis maintains that the district court erred in holding that constructive notice was sufficient in this case. In *Mennonite*, the Supreme Court held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well-versed in commercial practice, if its name and address are reasonably ascertainable." *Id.* at 800, 103 S.Ct. at 2712. The Court found that constructive notice of an impending tax sale was not sufficient to satisfy due process "[w]hen a mortgagee is

identified in a mortgage that is publicly recorded." *Id.* at 798, 103 S.Ct. at 2711.

Davis asserts that its identity and address were readily ascertainable from the conveyance records of Lafayette Parish and that it was therefore entitled to actual notice of the seizure and sale of the subject property.

The district court, however, found that information regarding Davis' interest in the subject property was not *reasonably* available to FNB as a seizing creditor. The district court held that "[a]bsent knowledge of the existence of a mineral lease, FNB was not constitutionally required to blindly search conveyance records for those interests."[20] The district court noted further that although Davis' failure to request notice under Louisiana Revised Statutes 13:3886 did not constitute a waiver of its due process rights, the existence of the request-notice statute should be a factor in determining the overall reasonableness of requiring a creditor to provide actual notice to parties with interests in the subject property. The district court held that RS 13:3886 was curative of any constitutional deficiency in Louisiana's constructive notice provisions only with respect to parties whose interests in the property are *not* otherwise reasonably ascertainable.

■ We note as an initial matter that the district court was absolutely correct in holding that a failure to request notice under RS 13:3886 does not constitute a waiver of due process rights. Although due process rights may be waived, a waiver of constitutional rights is not effective unless the right is intentionally and knowingly relinquished.[21] *Bueno v. City of Don-*

---

consider the limited nature of a lessee's rights sufficient grounds to alter our conclusion that Davis was "deprived" of a legally protected property interest within the meaning of the fourteenth amendment.

**20.** Relying on depositions of FNB employees who stated that they were aware that there had been a "blow out" at a well located in land adjacent to the subject tract, Davis maintains that FNB had reason to know of the existence of a mineral lease and should have made appropriate inquiries. Davis does not, however, dispute the district court's finding that FNB did not *actually* know of the existence of a lease. As we explain more fully below, we agree with the

district court that absent knowledge of the existence of a lease, FNB was not required to search the conveyance records to identify mineral lessees.

**21.** Although the Supreme Court has not held expressly that the standard for waiver of constitutional rights in non-criminal contexts is the same as in the criminal context, it has also declined to expressly adopt a lower standard. *See D.H. Overmeyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972) (finding waiver effective even under standard for criminal cases).

The Court *has* found constructive waiver of due process rights. *Insurance Corp. of Ireland*

na, 714 F.2d 484, 493–94 (5th Cir.1983) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Louisiana may *not* rely upon a legal fiction of implied waiver of due process rights to cure constitutional defects in its constructive notice provisions. To the extent that the district court's holding in *Mid–State Homes, Inc. v. Portis*, 652 F.Supp. 640 (W.D.La.1987), implies that RS 13:3886 would be constitutionally adequate as the sole determinant of parties entitled to notice of the seizure of property, we expressly reject that reasoning. *See also Bankers' Life Co. v. Shost*, 518 So.2d 563, 569 (La.App. Cir. 5 1987) (following *Portis* and holding that second mortgagee who failed to request notice under RS 13:3886 waived any right to object to adequacy of constructive notice).

As the district court correctly held in this case, a seizing creditor who avails itself of state foreclosure procedures is constitutionally obligated to provide "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The Louisiana request-notice statute does not relieve a creditor of this constitutional obligation if the creditor has reasonable means at its disposal to identify those parties whose interests will be adversely affected by the foreclosure.

We also agree with the district court, however, that the existence of RS 13:3886 is not wholly irrelevant to the determination of the reasonableness of constructive notice under particular circumstances.

Although the three justices who dissented in *Mennonite* expressed concern that the majority had abandoned the "reason-

ableness" inquiry of *Mullane* in favor of a rigid rule that constructive notice is never constitutionally adequate, 462 U.S. at 800–02, 103 S.Ct. at 2712–13 (O'Connor, J., dissenting), the Court's subsequent decision in *Pope* makes clear that the flexible principles enunciated in *Mullane* have not been abandoned. Rather, a reviewing court must "balanc[e] the 'interest of the State' and 'the individual interest sought to be protected by the Fourteenth Amendment.' ... The focus is on the reasonableness of the balance, and, as *Mullane* itself made clear, whether a particular method of notice is reasonable depends upon the particular circumstances." 485 U.S. at —, 108 S.Ct. at 1344; *see also Bender v. City of Rochester*, 765 F.2d 7, 10 (2d Cir.1985) (majority in *Mennonite* made no claim that it was departing from the flexible standard of *Mullane* ).

Applying the principles of *Mullane* and *Mennonite*, the district court concluded below that a search of the conveyance records to identify parties with mineral leases on the subject property would be unduly burdensome.

We note that to the extent that the district court opinion characterizes the burden imposed on a seizing creditor as requiring the creditor to identify *viable* mineral leases, the district court may not have framed its inquiry properly. The seizing creditor is not required to determine conclusively which property interests are in fact viable. Rather, the creditor is required only to undertake "reasonably diligent efforts" to identify and provide notice to parties having an interest in the subject property. *Pope*, 108 S.Ct. at 1348 (citing *Mennonite*, 462 U.S. at 798 n. 4, 103 S.Ct. at 2711 n. 4). The proper inquiry is therefore whether reasonable diligence requires that the seiz-

---

*v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (failure to comply with discovery constituted waiver of challenge based on lack of personal jurisdiction); *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (failure to make effort to contest parental termination proceedings constituted waiver of right to appointed counsel). However, these findings of constructive waiver were based upon specific conduct by the complaining party.

In contrast, the request-notice statute, if construed to be constitutionally adequate standing on its own, would establish a *presumption* that any person failing to request notice had waived his or her due process rights.

To shift in this fashion the burden of compliance with the Due Process Clause almost entirely to the shoulders of individual property owners would eviscerate the protections afforded by the Constitution. *See Mennonite*, 462 U.S. at 799, 103 S.Ct. at 2711.

ing creditor search the conveyance records for the names and addresses of persons holding mineral leases on the subject land.[22]

▉ Applying this standard, we nevertheless conclude that the record amply supports the district court's finding that a search of the conveyance records to identify parties with mineral interests would be unduly burdensome and "is a task beyond the routine examination of land records that was involved in *Mennonite.*" *See Bender,* 765 F.2d at 11.

In asserting that the district court's conclusion is erroneous as a matter of fact, Davis relies heavily on the deposition of Joan Broussard, an employee of the Lafayette Parish Clerk's office. While Ms. Broussard testified that she was able to identify Davis' lease and to make copies of the relevant documents within 24 minutes, the deposition also reveals that in order to identify Davis' lease, Ms. Broussard had to run a separate check to determine that the original lease to Louisiana Land Management had been assigned to Davis. Davis has established at most that it would be fairly easy to identify a single lessee—when the Clerk knows what to look for. This does not answer the question whether "reasonable diligence" would in general require a seizing creditor to search the Parish conveyance records. If a piece of property is subject to multiple leases, or if the interest in a single lease has been divided and assigned to different entities (as it in fact was in this case), the search for those with an interest in the property would require far more than an initial search of the conveyance records in the name of the owner of the subject property. The creditor would have to trace in turn the conveyance records of each subsequent assignee. Far from being a simple, 24 minute undertaking, a search of the conveyance records for the mineral interests on a single piece of

property could resemble a rather large tree with several limbs and innumerable branches. Thus, even if the creditor makes no attempt to determine the actual validity of a particular lease, the process of merely identifying those who *might* have an interest in a mineral lease could itself be extremely cumbersome. We conclude that the district court did not, therefore, overstate the burden to creditors of conducting this type of search.

In evaluating whether it is reasonable, under the circumstances, to require a seizing creditor to undertake a search of the conveyance records, we find the Second Circuit's reasoning in *Bender v. City of Rochester,* on which the district court also relied, to be persuasive. In *Bender,* the court considered whether due process required that the city search the records of the Surrogate's Court to determine whether the owner of property subject to a tax foreclosure had died and to identify the distributees of the subject property. The court noted that a search of the records of the Surrogate's Court would not necessarily reveal either the identity of the decedent's successors in interest or the nature of their interests. 765 F.2d at 11. On "the other side of the 'reasonableness' inquiry," the court noted that the city should be entitled to expect that the administrator of an estate would take steps to enter the fact of death in the land records or, at a minimum, would make arrangements to receive the decedent's mail in order to keep apprised of developments that could affect the estate. *Id.* at 11–12.

The court thus evaluated the burden of conducting a potentially fruitless search, together with the means available to the claimant to protect his asserted interest, and concluded that "[i]n light of all the pertinent circumstances," the names of distributees were not "reasonably ascertain-

---

**22.** Similarly, the district court opinion at times frames the relevant standard as whether the name and address of the party is "very easily ascertainable," citing *Schroeder v. City of New York,* 371 U.S. 208, 212–13, 83 S.Ct. 279, 282–83, 9 L.Ed.2d 255 (1962). *Mullane* itself generally speaks in terms of "reasonableness" and both

*Mennonite* and *Pope* use the language "reasonably ascertainable." *Mennonite,* 462 U.S. at 800, 103 S.Ct. at 2712; *Pope,* 108 S.Ct. at 1348. Although we find no reversible error on the part of the district court, we apply the standard as it is phrased in the Supreme Court's more recent decisions.

able" within the meaning of *Mennonite. Id.* at 12.

In the instant case, we evaluate the burden of requiring a seizing creditor to wend its way through a potentially complex maze of leases and assignments in order to identify interested parties, together with the relatively simply means available, under RS 13:3886, to ensure receipt of notice.[23] We conclude that under the circumstances "reasonable diligence" did not require that FNB search the conveyance records to ascertain the identities of mineral lessees.[24]

We are aware, as was the Second Circuit, that *Mennonite* states explicitly that "a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." 462 U.S. at 799, 103 S.Ct. at 2712. We agree with the Second Circuit, however, that "the initial determination of what obligation due process imposes must take into account what the interested party, or someone obligated to act on its behalf, is likely to do." 765 F.2d at 11.

Specifically, we do not construe *Mennonite* as requiring actual notice to every party who has a publicly recorded interest in the subject property. *But see Verba v. Ohio Casualty Ins. Co.*, 851 F.2d 811, 816 (6th Cir.1988) (holder of publicly recorded lien

entitled to more than constructive notice of tax sale); *Harris v. Gaul*, 572 F.Supp. 1554, 1561 (N.D.Ohio 1983) (holder of property interest that is both "legally protected" and "publicly recorded" must be given actual notice of a pending sale). Given the complexity of land records in some jurisdictions, the "reasonableness" constraint of *Mullane* must limit the broad language of *Mennonite. See Pope*, 108 S.Ct. at 1344. Accordingly, the reasonableness of constructive notice in a particular case may turn on the nature of the property interest at stake and the relative ease or difficulty of identifying such interest holders from the land records and also on the existence of alternative means of insuring the receipt of notice.

Mills argues vehemently that Davis should not be heard to complain of the foreclosure because parties in the oil and gas industry are well aware that a mineral lease may be extinguished by foreclosure on a superior mortgage. Mills notes that it is common practice to obtain a subordination of a superior mortgage in order to protect a mineral lease from precisely the eventuality complained of here. While Davis' failure to obtain a subordination in no way eliminates Davis' due process rights, this factor does indicate that it is

---

**23.** We note that RS 13:3886(D) which provides that "[t]he failure of the sheriff to notify a person requesting notice of seizure shall not affect the rights of the seizing creditor nor invalidate the sheriff's sale" may pose constitutional problems to the extent that RS 13:3886 is not wholly supplementary to the notice that is required by the Due Process Clause. That issue, however, is not properly before us in this case since Davis did not request notice under RS 13:3886.

**24.** This holding is not inconsistent with *Bonner* and *Portis* which held, respectively, that a third possessor and a second mortgagee were entitled (with some qualifications in each case) to more than constructive notice of the seizure of property in a foreclosure by executory process. *Bonner*, 452 F.Supp. at 1302; *Portis*, 652 F.Supp. at 645.

Because the reasonableness of requiring a particular method of notice depends on the particular circumstances, *Pope*, 108 S.Ct. at 1344, a reviewing court could easily conclude that the search of property records required to identify a third possessor or second mortgagee is less bur-

densome than that required to identify parties with mineral interests in the same land.

Davis observes that a seizing creditor would already be required, under *Bonner*, to search the conveyance records to determine whether the subject property had been sold to a third party. First, without expressing an opinion on the matter, we note that the holding in *Bonner* is more limited than Davis states—the court relied heavily on the fact that the mortgagee in *Bonner knew* the name and address of the third possessor.

Second, and more importantly, as we note above, a search of the conveyance records does not consist of a single search, but would also involve tracing any subsequent transfers made by the persons to whom the original owner had sold or leased a property interest. It is therefore reasonable to draw some line limiting a seizing creditor's obligation to search land and conveyance records.

Our holding today rests upon the particular complexity of identifying mineral interests through a search of Parish conveyance records and should not be construed to undermine the holdings in *Bonner* and *Portis*.

not unreasonable to expect that a party in Davis' position, having elected not to obtain a subordination, would at least take the minimal step of requesting notice under RS 13:3886—which would have ensured that in the event of a foreclosure Davis would have an opportunity to preserve its interest by bidding at the sheriff's sale.

The act of requesting notice under the statute does not, moreover, impose a burden of constant vigilance on the property owner. Rather, it allows one whose identity as an interest holder may not otherwise be readily ascertainable to protect his or her interest in the subject property through a single, simple act. We therefore do not believe that our limited reliance on RS 13:3886 runs afoul of *Mennonite*.[25]

We therefore conclude that the district court correctly held that under the circumstances, constructive notice of the seizure and sale of the subject property was sufficient to satisfy the requirements of due process.[26]

### III.

For the reasons set forth above, the judgment of the district court is AFFIRMED.

---

**25.** The Supreme Court has held that a provision for requesting notice may save a notice procedure that is otherwise constitutionally suspect. In *Lehr v. Robertson,* 463 U.S. 248, 263–64, 103 S.Ct. 2985, 2994–95, 77 L.Ed.2d 614 (1983), the Court upheld against due process challenge a New York statutory scheme for providing notice of pending adoptions to unmarried fathers where the state provided for automatic notice to putative fathers who were likely to have assumed responsibility for the child and also created a putative father registry. Because the plaintiff in *Lehr,* who did not fall into any of the seven categories of persons entitled to automatic notice, had failed to avail himself of the request-notice provision, the Court held that he was not entitled to notice of the pending adoption proceedings. *Id.* at 264–65, 103 S.Ct. at 2994–95; *cf. Kickapoo Tribe of Oklahoma v. Rader,* 822 F.2d 1493, 1499–1500 & n. 8 (10th Cir.1987) (noting absence of request-notice provision or other procedural protections in Oklahoma law in holding that efforts to locate father did not satisfy due process).

**26.** Our holding makes it unnecessary for us to address the propriety of the remedy sought by Davis.